**ROTH STEEL TUBE COMPANY,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–1656.

United States Court of Appeals,
Sixth Circuit.

Argued July 25, 1986.

Decided Sept. 10, 1986.
Rehearing and Rehearing En Banc
Denied Oct. 22, 1986.

Bennet Kleinman (argued), Frederick N. Widen, Robert L. Merritt, Cleveland, Ohio, for petitioner-appellant.

Fred T. Goldberg, Jr., Chief Counsel, Internal Revenue Service, Michael L. Paup (Lead Counsel), Glenn L. Archer, Jr., Roger M. Olson, David E. Carmack, Gayle P. Miller (argued), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before MILBURN and BOGGS, Circuit Judges, and DeMASCIO, District Judge.*

MILBURN, Circuit Judge.

Roth Steel Tube Company ("taxpayer") appeals from a decision of the United States Tax Court sustaining deficiencies in the amount of $1,728,802 determined by the Commissioner of Internal Revenue ("the Commissioner") with respect to taxpayer's federal income tax liability for the taxable years 1971 through 1975. The principal issue presented is whether taxpayer's unrepaid advances to a subsidiary corporation were loans deductible as bad debts under 26 U.S.C. § 166 or capital contributions deductible only to the extent of capital gains under 26 U.S.C. § 1221. Because the Tax Court's factual determination that the advances were capital contri-butions and not loans is not clearly errone-ous, we affirm.

## I.

The facts are carefully set out in the opinion of the Tax Court, 79 T.C.M. (CCH) 698 (1985), and will only briefly be set forth here. Taxpayer is an Ohio corporation whose principal business activity during the years at issue was the manufacture and sale of steel tubing. In August 1972, taxpayer acquired sixty-two percent of the stock of Remco Industries, Inc. ("Remco"), a manufacturer of children's toys. Subse-quent to taxpayer's acquisition of Remco. Remco's board of directors and key management personnel were replaced by taxpayer's personnel.

During the two years prior to its acquisi-tion by taxpayer, Remco had sustained sub-stantial losses from its operations. On Jan-uary 21, 1971, Remco filed a petition for an arrangement under Chapter 11 of the Bankruptcy Act, and Remco's plan of ar-rangement was confirmed on April 28, 1971. Under the plan, Bankers Trust Com-pany ("Bankers") was to advance $7,500,-000 to Remco, and the advance was to be secured by a first mortgage in that amount on Remco's real estate and a security inter-est in all inventory owned or acquired by Remco. Remco was to use the amount borrowed from Bankers to pay existing indebtedness to Bankers of approximately $6,000,000 and to use the remainder to pay other creditors.

The plan of arrangement also provided that James Talcott, Inc. ("Talcott") would advance funds to Remco to be secured by a security interest in Remco's accounts re-ceivable, goods and chattels, inventory, warehouse receipts, and general intangi-bles. Talcott was also given a third mort-gage on certain real estate owned by Rem-co and was assigned Remco's claim for federal income tax refund for the years 1968 and 1969. Talcott would advance

* Honorable Robert E. DeMascio, Judge, United States District Court, Eastern District of Michi-

gan, sitting by designation.

$2,900,000 to Remco with an agreement to advance additional sums to Remco based on seventy-five percent of Remco's eligible accounts receivable. This agreement was subsequently modified to provide that Talcott, in its discretion, would lend up to $11,000,000 on a borrowing base of seventy-five percent of eligible accounts receivable and an additional $1,000,000 on a borrowing base of fifty percent of inventory value. The plan further provided that Remco would execute a second mortgage on its real estate and provide a subordinated security interest in its machinery, equipment, and inventory to William N. Otte ("Otte"), secretary to the creditor's committee of Remco, to secure payments due Remco's general creditors in the amount of $1,186,420.

The plan provided for repayment of the Bankers and Talcott loans. Remco was to make quarterly payments of principal to Bankers in the amount of $93,750 from August 1, 1971, through May 1, 1976, when a final installment in the amount of the unpaid balance of principal and accrued interest was to be made. Remco was also required to make quarterly payments of interest to Bankers. Other payments to Talcott and Bankers were to be made from collections on accounts receivable arising prior to January 21, 1971. Additionally, Remco was required to pay Bankers a percentage of after-tax, net income over the amount of $1,000,000. Otte was to be paid on the following schedule:

| | |
|---|---|
| January 15, 1972 | $ 50,000 |
| April 26, 1972 | $ 284,089 |
| October 26, 1972 | $ 284,111 |
| April 26, 1973 | $ 284,110 |
| October 26, 1973 | $ 284,110 |

Talcott was authorized to collect accounts receivable and to negotiate any payment made to Remco. Any loans made by Talcott pursuant to the agreement were payable on demand.

At the end of Remco's 1971 calendar year, Remco's balance sheet disclosed an excess of current assets over current liabilities of $1,106,263, but its total liabilities exceeded total assets by $3,046,072. Rem-

co's statement of operations for 1971 reported a loss in the amount of $4,443,483. During 1972, Remco continued to experience financial difficulties, and, at the end of Remco's 1972 calendar year, Remco's balance sheet disclosed an excess of current liabilities over current assets in the amount of $2,698,762 and an excess of total liabilities over total assets in the amount of $5,925,175. Remco's statement of operations for 1972 reported a loss in the amount of $3,274,155. Assuming the sale of Remco's Harrison facility, Remco had total debts in the amount of $8,794,372 and total equity in the amount of $28,063.

In 1973, Remco introduced its new product line at the annual Toy Fair. Remco projected that it would have gross sales for 1973 of at least $22,000,000 and that net sales for 1973 would be approximately $19,000,000. Remco also projected that for 1973 it would have a total pre-tax net income of $550,000. Additionally, a cash availability analysis was prepared for 1973 which indicated that, after repayment of current loan obligations, cash receipts would exceed cash disbursements by $305,000. These projections were reviewed by taxpayer's management.

In 1972 and early 1973, Remco reached agreements with Bankers, Otte, and Talcott which permitted Remco to defer payments due each respective creditor. Bankers permitted Remco to pay the amount of $251,544.38 due on May 1, 1972, in monthly installments of $10,000 through December 29, 1972, when the balance of the amount due, together with interest, was to be paid. Bankers also agreed to an extension of the time for payment of approximately $360,000 of interest due for the period ending December 31, 1972. Otte permitted Remco to defer its final three payments of approximately $283,500 each, due on October 26, 1972, April 26, 1973, and October 26, 1973, under the plan of arrangement, to January 26, 1973, April 26, 1974, and October 26, 1974, respectively. Talcott permitted Remco to pay the $400,000 promissory note due on May 1, 1972, in monthly installments of $50,000, commencing on October 1, 1972,

with the balance payable on December 31, 1972.

From November 3, 1972, through October 15, 1973, taxpayer made unsecured cash advances to Remco in the amount of $3,420,000. The advances, which were made to provide working capital needed for Remco's operations, included $587,850 from Roth Properties, Inc. ("Properties"), a subsidiary of taxpayer. With the exception of the $10,000 advance made on September 7, 1973, all the advances made by taxpayer to Remco were recorded on taxpayer's general ledger as receivables from Remco. On September 10, 1973, Remco repaid the $10,000 advance, and, in addition, Properties discharged the liability for payment of the advance made by taxpayer on its behalf in the amount of $587,850 as part of the purchase price for Remco's Harrison facility.

No interest was paid on any of these advances. Remco, however, reflected accrued interest expenses on its accounting records, and taxpayer recorded "Interest Income—Remco" and "Interest Receivable —Remco" on its general ledger. Taxpayer reported some of the interest from Remco on its federal income tax returns for the years ending April 30, 1973, and April 30, 1974.

Although resolutions of Remco's board of directors directed its officers to execute notes evidencing the indebtedness, the advances were not evidenced by notes or other instruments of indebtedness. One resolution of taxpayer's board of directors authorized loans to Remco, and resolutions of Remco's board of directors approved receipt of advances from taxpayer in the aggregate amount of $2,997,150. Only the resolution of November 3, 1972, by Remco's board of directors approving receipts in the amount of $175,000 stated the period of the advance or the rate of interest payable. The resolution also provided, in pertinent part, that: "The directors deem it to be in the best interest of Remco to effect such borrowing from [taxpayer], which borrowing can be made on terms and at a rate of interest substantially more favorable

and beneficial to Remco than are obtainable elsewhere."

Taxpayer's source of funds for the advances to Remco was its own capital sources, including loans from Society National Bank and Talcott. Society National Bank financed the initial advance to Remco in the amount of $175,000 but was unwilling to finance subsequent advances. Talcott agreed to make loans to taxpayer and its subsidiary corporations. The Talcott loans were secured by accounts receivable, inventory, equipment, real estate, guaranties, and other collateral. The loan agreement required that taxpayer and the subsidiary corporations advance $1,650,000 to Remco and required Remco to sell its Harrison facility to Properties. Properties and Remco executed an agreement for the sale of the real estate on May 16, 1973. A purchase price of $7,500,000 was to be paid by Properties' assumption of the unpaid balance on the first mortgage held by Bankers and, as stated above, by assumption of liability for advances made by taxpayer to Remco on behalf of Roth Properties in the amount of $587,850.

Despite the new management and the infusion of additional funds, Remco continued to experience financial difficulties. For the periods ending February 4, 1973, and March 4, 1973, the actual results of operations were more favorable than had been projected. However, for the period ending April 1, 1973, through the period ending December 2, 1973, the actual results of operations were less favorable than projected due to a lower volume of net sales than anticipated. At the end of 1973, Talcott refused to make any further loans to Remco, and Remco discontinued operations because of a lack of working capital. Remco ceased operations in January of 1974, and its assets were turned over to Talcott.

On its federal income tax return for the fiscal year ending April 30, 1974, taxpayer claimed a deduction in the amount of $3,582,848 as a loss on its investment in the Remco stock and its advances to Remco. This claimed deduction resulted in a net

operating loss for which taxpayer claimed carry-over deductions to offset its income for the fiscal years ending April 30, 1971, April 30, 1972, April 30, 1973, June 30, 1974, and June 30, 1975.

On audit the Commissioner determined that the losses claimed by taxpayer were capital losses which are deductible only to the extent of capital gains. Since taxpayer had no capital gains in that year, the Commissioner determined that no deduction was permitted. In addition, the Commissioner disallowed taxpayer's net operating loss deductions for the other fiscal years that had been based on the deductions claimed for April 30, 1974 fiscal year. Taxpayer was issued a statutory notice of deficiency to that effect.

The Tax Court sustained the Commissioner's determination. The Tax Court found that taxpayer's loss on its investment in the Remco stock was capital, rather than ordinary, in nature. The Tax Court also found that taxpayer purchased the Remco stock as an investment and, as a result, taxpayer failed to establish that the purchase fell within the limited, judicially-created exception to the general rule that a loss sustained with respect to stock is treated as a capital loss. *See Corn Products Refining Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

The Tax Court disallowed taxpayer's claim to a deduction as bad debts under 26 U.S.C. § 166, for the advances it had made to Remco, finding that these advances were not loans but were instead capital contributions. The Tax Court thus concluded that all of taxpayer's losses were capital in nature which could be used only to offset capital gains.

Thereafter, taxpayer filed a motion to vacate the decision contending that all or, alternatively, various portions of the advances to Remco were loans and that it was entitled to deduct an accounts receivable in the amount of $50,730, which taxpayer claimed represented accrued, but unpaid, interest due from Remco. Pursuant to a memorandum order, the Tax Court denied taxpayer's motion. In that memorandum,

the Tax Court again reviewed the evidence that led it to its finding that the advances were contributions to Remco's capital and were not loans. It further concluded that the taxpayer had not presented evidence establishing its entitlement to a deduction with respect to the accounts receivable.

## II. CAPITAL CONTRIBUTIONS OR LOANS

### A. *Standard of Review*

Taxpayer argues that the Tax Court erred in finding that the advances to Remco were capital contributions rather than loans. A reviewing court may not set aside factual findings made by the Tax Court unless they are clearly erroneous. *See* 26 U.S.C. § 7482 (renders Rule 52(a) of the Federal Rules of Civil Procedure applicable to review of Tax Court decisions). Courts have, however, taken opposing views on whether the question of capital contributions versus loans is a question of law or fact. *See, e.g., Estate of Mixon v. United States,* 464 F.2d 394, 402–03 (5th Cir.1972) (the question of capital contributions versus loans is primarily one of law subject to *de novo* review); *Bauer v. Commissioner,* 748 F.2d 1365, 1367 (9th Cir.1984) (the question of capital contributions versus loans is one of fact subject to clearly erroneous review). This court has previously held that the question of whether advances to a corporation constitute capital contributions or loans is a question of fact. *Smith v. Commissioner,* 370 F.2d 178, 180 (6th Cir.1966). Thus, we must review the Tax Court's determination that taxpayer's advances to its subsidiary corporation were capital contributions and not loans under the clearly erroneous standard.

### B. *Analysis*

Bad debts which become worthless within the taxable year are deductible as ordinary losses under 26 U.S.C. § 166(a)(1). The right to a deduction is limited to genuine debt, and capital contributions are not considered debt for the purposes of section 166(a)(1). *Raymond v. United States,* 511

F.2d 185, 189 (6th Cir.1975). Capital contributions are added to the basis of the shareholder's stock, and, if the stock later becomes worthless, the shareholder is entitled to a capital loss. 26 U.S.C. § 165(g)(1).

█ The determination of whether advances to a corporation are loans or capital contributions depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances. *Raymond*, 511 F.2d at 190. "Advances between a parent corporation and a subsidiary ... are subject to particular scrutiny 'because the control element suggests the opportunity to contrive a fictional debt'." *United States v. Uneco, Inc.*, 532 F.2d 1204, 1207 (8th Cir.1976) (quoting *Cuyuna Realty Co. v. United States*, 382 F.2d 298, 300–01 (Ct.Cl.1967)). The taxpayer carries the burden of establishing that the advances were loans rather than capital contributions. *Smith*, 370 F.2d at 180.

█ This court has identified a number of factors to be used in making the capital contribution versus loan determination: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *See Raymond*, 511 F.2d at 190–91; *Austin Village, Inc. v. United States*, 432 F.2d 741, 745 (6th Cir. 1970); *Berthold v. Commissioner*, 404 F.2d 119, 122 (6th Cir.1968); *Smith*, 370 F.2d at 180. No one factor is controlling or decisive, and the court must look to the particular circumstances of each case.

*Smith*, 370 F.2d at 180. We will consider each factor separately.

### 1. Identity of Interest Between Creditor and Stockholder

The Tax Court found that taxpayer owned only sixty-two percent of Remco's stock and that the other shareholders did not make proportionate advances to Remco. "If advances are made by stockholders in proportion to their respective stock ownership, an equity contribution is indicated.... A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is, however, strongly indicative that the debt is bona fide." *Estate of Mixon*, 464 F.2d at 409 (citations omitted); *see also* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 4.04, at 4–10 to 11 (1979) (hereinafter cited as Bittker & Eustice). Although a substantial disparity exists between taxpayer's holdings of debt and stock, this disparity alone is not fatal to debt classification. Bittker & Eustice, *supra*, at 4–11; *cf. Foresun, Inc. v. Commissioner*, 348 F.2d 1006, 1009 (6th Cir.1965) (non-shareholder debt classified as equity notwithstanding disproportionate interests of creditors and shareholders).

### 2. Adequacy or Inadequacy of Capitalization

The Tax Court found that Remco was "seriously" undercapitalized and that "Remco's debt to equity ratio at December 31, 1972, was in excess of 300 to 1." Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans. *See Bauer*, 748 F.2d at 1369; *see also Estate of Mixon*, 464 F.2d at 408; *Foresun*, 348 F.2d at 1009; Bittker & Eustice, *supra*, at 4–12. Advances made to a corporation whose debt to equity ratio exceeds 300 to 1 are indicative of venture capital rather than loans. *See Gilbert v. Commissioner*, 248 F.2d 399, 407 (2d Cir.1957) (excessive debt structure indicate of venture capital).

### 3. Source of Repayments

The Tax Court found that repayment of the advances made by taxpayer were dependent on the financial success of Remco and that taxpayer could not have had a reasonable expectation of repayment at any time during the period in which the advances were made. If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution. *Lane v. United States*, 742 F.2d 1311, 1314 (11th Cir.1984); *Estate of Mixon*, 464 F.2d at 405. An expectation of repayment solely from corporate earnings is not indicative of bona fide debt regardless of its reasonableness. *See Lane*, 742 F.2d at 1314.

### 4. Name Given Instruments Evidencing Indebtedness

The Tax Court found that although taxpayer and Remco reported substantially all the advances as loans on their accounting records, no instruments of indebtedness were executed. The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans. *Stinnett's Pontiac Service, Inc. v. Commissioner*, 730 F.2d 634, 638 (11th Cir.1984); *Raymond*, 511 F.2d at 191; *Estate of Mixon*, 464 F.2d at 403. The entry of the advances as loans on the accounting records of both entities provides little if any support for a finding of bona fide debt. *Raymond*, 511 F.2d at 191.

### 5. Presence or Absence of Fixed Maturity Date and Schedule of Payments

The Tax Court found that the only advance for which the parties established a due date was the initial advance which, although scheduled to be repaid within sixty days, was never repaid at all. The absence of a fixed maturity date and a fixed obligation to repay indicates that the advances were capital contributions and not loans. *Lane*, 742 F.2d at 1316; *Stinnett's Pontiac*, 730 F.2d at 638–39; *Raymond*, 511 F.2d at 191; *Estate of Mixon*, 464 F.2d at 404.

### 6. Presence or Absence of a Fixed Rate of Interest and Interest Payments

The only indication of a rate of interest in this case was that taxpayer would charge Remco whatever rate it would have to pay to borrow the funds, and the Tax Court found that no interest payments were actually made. The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans. *Stinnett's Pontiac*, 730 F.2d at 640; *Raymond*, 511 F.2d at 191; *Austin Village*, 432 F.2d at 745.

### 7. Presence or Absence of Security

The Tax Court found that all taxpayer's advances to Remco were unsecured. The absence of security for the advances is a strong indication that the advances were capital contributions rather than loans. *Lane*, 742 F.2d at 1317; *Raymond*, 511 F.2d at 191; *Austin Village*, 432 F.2d at 745.

### 8. Inability to Obtain Outside Financing

The Tax Court found that Talcott was willing to make loans to Remco only on the condition of ample security as well as numerous other conditions that would enable it to recover its loans. The Tax Court also found that another commercial lender had declined to lend taxpayer funds for Remco's use. The fact that no reasonable creditor would have acted in the same manner as the taxpayer is strong evidence that the advances were capital contributions rather than loans. *Stinnett's Pontiac*, 730 F.2d at 640; *Estate of Mixon*, 464 F.2d at 410.

### 9. Subordination of Advances

The Tax Court found that taxpayer's only hope for repayment would be after obligations to Remco's other creditors were satisfied. Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and

not loans. *Stinnett's Pontiac,* 730 F.2d at 639; *Raymond,* 511 F.2d at 191; *Austin Village,* 432 F.2d at 745.

#### 10. Presence or Absence of a Sinking Fund

The Tax Court found that the taxpayer looked solely to Remco's earnings for repayment of the advances. The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans. *Lane,* 742 F.2d at 1317; *Raymond,* 511 F.2d at 191; *Austin Village,* 432 F.2d at 745.

#### 11. Extent to Which the Advances Were Used to Acquire Capital Assets

The Tax Court found that taxpayer's advances to Remco were for day-to-day operations rather than the purchase of capital assets. Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness. *Stinnett's Pontiac,* 730 F.2d at 640; *Raymond,* 511 F.2d at 191; *Estate of Mixon,* 464 F.2d at 410.

■ Having considered these various factors, we cannot conclude that the Tax Court's finding that the taxpayer's advances were capital contributions and not bona fide loans is clearly erroneous. The fact that thirty-eight percent of Remco's stock was owned by shareholders who did not make proportionate advances and the fact that the advances were not used to acquire capital assets support taxpayer's argument. However, these two factors do not provide sufficient justification for rejecting the Tax Court's determination that, considering all the factors, the advances were capital contributions.

### III. ORDINARY DEDUCTION FOR WORTHLESS SECURITIES

Taxpayer argues, for the first time on appeal, that the entire loss sustained as a result of its stockholdings in Remco, including any advances deemed capital contributions, are deductible as an ordinary loss

under 26 U.S.C. § 165(g)(3). Under 26 U.S.C. § 165(g)(1), worthless securities give rise to a capital loss as of the last day of the taxable year in which the securities became worthless. However, a corporate taxpayer can obtain an ordinary loss for worthless stock under 26 U.S.C. § 165(g)(3) if the stock is held in an affiliated corporation. A corporation shall be treated as affiliated with the taxpayer if "80 percent of the voting power of all classes of its stock and at least 80 percent of each class of its non-voting stock" is owned directly by the taxpayer and if "more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents ..., dividends, interest ..., annuities, and gains from sales or exchanges of stocks and securities." 26 U.S.C. § 165(g)(3).

■ We need not, however, address taxpayer's argument. The general rule is that issues not raised before the Tax Court are inappropriate for appellate consideration. *Cooper v. Commissioner,* 542 F.2d 599, 601 (2d Cir.1976) (per curiam); *Adolph Coors Co. v. Commissioner,* 519 F.2d 1280, 1284 (10th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *Hayutin v. Commissioner,* 508 F.2d 462, 485 (10th Cir.1974); *Livernois Trust v. Commissioner,* 433 F.2d 879, 883 (6th Cir. 1970); *Reeves v. Commissioner,* 314 F.2d 438, 439 (6th Cir.1963). This rule is particularly applicable where, as here, resolution of the issue would require further factual determination. *See Dennis v. Commissioner,* 473 F.2d 274, 282 (5th Cir.1973). Resolution of the issue raised by taxpayer would require a factual determination with respect to whether taxpayer satisfied the gross receipts test of section 165(g)(3).

### IV. ORDINARY DEDUCTION FOR UNPAID INTEREST

Taxpayer argues, in a wholly conclusory fashion, that it should be allowed an ordinary deduction in the amount of $50,730 designated as "Accounts Receivable—Remco Industries, Inc." According to taxpay-

er, this amount represents accrued but unpaid interest on its advances to Remco. The Commissioner, in his notice of deficiency, characterized this amount as a capital loss, but urged in his brief before the Tax Court that no deduction should be allowed. The taxpayer, in its reply brief, argued that the amount was deductible as an ordinary loss. The Tax Court refused to consider the issue stating that neither party had presented evidence sufficient to permit determination of the deductibility of this amount. The Tax Court further observed that taxpayer had failed to carry its burden of proving that this amount was "interest receivable which had been included in its income."

■ The Commissioner's determination of a tax deficiency is presumptively correct, and the burden of disproving the deficiency rests with the taxpayer. *BASF Wyandotte Corp. v. Commissioner*, 532 F.2d 530, 538 (6th Cir.1976). In order to establish an entitlement to an ordinary deduction, taxpayer would have had to show, at a minimum, that this amount was reported as income. *See Maryland Savings-Share Insurance Corp. v. United States*, 644 F.2d 16, 27 n. 14 (Ct.Cl.1981); *W.L. Moody Cotton Co. v. Commissioner*, 143 F.2d 712, 714 (5th Cir.1944). Taxpayer failed to make the required showing and, therefore, was not entitled to an ordinary deduction.

### V.

Accordingly, the decision of the Tax Court is AFFIRMED.