**In re COLD HARBOR ASSOCIATES, L.P., Debtor.**

**Bankruptcy No. 94–33996–S.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Jan. 16, 1997.

906

Kevin R. Huennekens, Michael A. Condyles, Daniel A. Gecker, Maloney, Barr & Huennekens, Richmond, VA, for Debtor.

James M. Nolan, Michael D. Mueller, Mays & Valentine, L.L.P., Richmond, VA, for Petitioning Creditor.

Gregg R. Nivala, Assistant United States Trustee, Office of the United States Trustee, Richmond, VA.

*ON REMAND FROM THE HONORABLE RICHARD L. WILLIAMS UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA RICHMOND. C.A. NO. 3:95CV197*

BLACKWELL N. SHELLEY, Bankruptcy Judge.

### Opening Statement

This matter returns to this Court on remand from the District Court for a determination as to the number of parties holding claims against Cold Harbor when the involuntary petition was filed.

### Findings of Fact

On November 4, 1994, ALI, Inc. (ALI) filed an involuntary Chapter 11 petition against Cold Harbor Associates, L.P. (Cold Harbor) as a sole petitioning creditor in an effort to resolve a dispute between the parties concerning a nonrecourse note on which payments were not being made held by ALI and secured by deed of trust on the Cold Harbor Shopping Center, the principal asset of Cold Harbor, exclusive of the adjacent unimproved parking lot properties, also owned by Cold Harbor. The nonrecourse note with a value of approximately $1,475,000 was due and payable in May, 1992, and has been in default since April, 1992. In response, and in an attempt to thwart the effect of the involuntary Chapter 11, Cold Harbor filed its own voluntary Chapter 7 petition and a motion to dismiss the involuntary Chapter 11 petition. After a hearing in chambers on January 18, 1995 this Court entered an Order for Relief on the involuntary petition and necessarily dismissed Cold Harbor's Chapter 7 petition as it was required to do in order to prevent the impermissible result of a debtor having two open bankruptcy cases in the same court at the same time. Cold Harbor appealed the entry of the Order for Relief to the District Court which entered a Memorandum Opinion and Order on August 9, 1995 affirming all of this Court's findings, but remanding the matter back to this Court for a determination of the number of "holders of claims" as of the date of the involuntary petition. Cold Harbor appealed the matter, but the Fourth Circuit Court of Appeals dismissed Cold Harbor's appeal of the District Court's order for lack of jurisdiction, and this dispute returned to this Court. On November 14, 1996, this Court held a hearing for the purpose of ascertaining the number of "holders of claims" as of November 4, 1994.

The language of the remand order from the District Court to this Court is quite brief. In the Memorandum Opinion, the District Court stated:

> Without the benefit of factual findings from the Bankruptcy Court, *this Court is unable to rule on whether ALI can qualify as a sole petitioning creditor.* Therefore, this matter is remanded to the Bankruptcy Court for a determination as to the number of holders of claims against Cold Harbor at the time the involuntary petition was filed.

Memorandum Opinion at 6 (emphasis added).

By the express language of the Memorandum Opinion, the District Court reserved to itself the ability to determine if ALI can continue as a sole petitioning creditor. It is clear that the only input the District Court

desired from this Court is a factual finding, a number. Any arguments concerning the legal effect of the facts must be made before the District Court, as this Court is without the authority to rule upon them. This conclusion is further buttressed by the Fourth Circuit's treatment of the nature of the remand language in its opinion declining jurisdiction. "The district court ... believed that a remand for fact finding on the number of creditors was necessary. As a result, *the district court* expressly deferred determination of the three-petitioner issue." Slip Op. at 3 (emphasis added). The remand was expressly for the purpose of fact finding, and none other. The opinion of the District Court would indicate that they made no determination of any legal issues related to the three-petitioner question. The District Court has retained jurisdiction to determine this issue.

■ ALI has strenuously argued that Cold Harbor should be precluded from amending the record to show that they had more than twelve creditors as of November 4, 1994. ALI bases its contention upon the theories of waiver and judicial estoppel, claiming since Cold Harbor admitted it had fewer than twelve creditors in its answer to the original involuntary petition they are now barred from presenting evidence of the existence of twelve or more creditors. ALI buttresses this argument by pointing out that when Cold Harbor filed its own voluntary Chapter 7 petition, its pleadings once again reflected fewer than twelve creditors. Cold Harbor responded these issues were presented to the District Court and the Circuit Court, both of which found ALI's argument to be without merit. This Court believes that Cold Harbor has misstated the record of this case. Whether or not the argument was presented to Judge Williams, his August 9, 1995 Order and Memorandum Opinion is devoid of any mention of the issues of waiver or judicial estoppel. In addition, the Fourth Circuit Court of Appeals expressly declined to resolve the issue in its opinion.

[I]t would not be appropriate for us to decide the waiver issue (and thus perhaps the three-petitioner issue) in the first instance. Although we have no idea at this stage how this subject will or should be resolve, it at least has the potential to be dispositive of the case.

Slip Op. at 3.

Despite the fact this issue appears to have been preserved for future. determination by both the District Court and the Circuit Court, this Court does not believe that resolution of this issue is appropriate in this Court. As previously noted, the District Court's remand instructions confined the permissible scope of the present inquiry to the purely factual issue of the number of creditors existing as of November 4, 1994. If the parties desire a ruling on the issues of waiver and estoppel presented by ALI, they must look elsewhere.

The requirements for commencing an involuntary petition in bankruptcy is found in 11 U.S.C. § 303(b), which states:

§ 303(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person, and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549 or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims.

At the present time, all disputes as to whether ALI may qualify as a sole petitioning creditor under § 303(b) have been resolved in ALI's favor save for the issue now before the Court concerning the number of creditors as of the date of the petition.[1]

---

1. It might be added that these issues were not raised with this Court prior to the entry of the order for relief because the petition asserted there were less than twelve creditors and the answer filed by Cold Harbor did not challenge that allegation. There was no reason for this

At the fact finding hearing held before this Court on November 12, 1996, Cold Harbor introduced evidence which it claimed showed the existence of thirty-six creditors as of the date of the involuntary petition. These thirty-six purported creditors can be divided into four broad categories for purposes of analysis. The first creditor is ALI itself. Second, Cold Harbor alleged it was indebted to twelve creditors as a result of the day to day operations of Cold Harbor Shopping Center. The third group of alleged creditors are eleven tenants at the shopping center, whom Cold Harbor claims are creditors as a result of the security deposits they gave to Cold Harbor in connection with their commercial leases. The fourth group consists of eleven limited partners of the Cold Harbor whom it alleges loaned money to the partnership in 1992. The court will consider each group of alleged creditors in turn.

### ALI, Inc.

Neither party contended at the fact finding hearing that ALI was not a creditor at the date of filing. As the existence of ALI as a claim holder is apparently not in dispute, this Court will not engage in a lengthy analysis on this issue and will count ALI as the first creditor whose existence has been established for purposes of the Court's § 303(b) inquiry.

### The Trade Creditors

Cold Harbor has attempted to demonstrate that several relatively small debts incurred as a result of the day-to-day operations of Cold Harbor Shopping Center were claims against the Debtor for purposes of § 303(b). ALI contended many of the potential claims in question were more properly characterized as debts of the shopping center's management company, Drucker & Falk, rather than a debt attributable to Cold Harbor Associates.

■ For § 303(b) purposes, the question of whether a creditor holds a claim against a management company or the owners of property it manages is subjective. The determination turns on whether the creditor in question believed that it was dealing with the principal or the agent. "[I]n the minds of creditors, the services rendered were to be paid by the management company." *In re Arriola Energy Corp.*, 74 B.R. 784, 788 (S.D.Tex.1987). In that case, the debtors, several oil and gas partnerships, introduced evidence of several debts incurred on behalf of the debtors that had been paid from the accounts of the management company, but would be repaid by the debtors to the management company. The mere fact that the management company might simply turn around and charge the parent company in question was not considered relevant to establish a debtor-creditor relationship between the creditors and the partnerships, and the District Court sitting as an appellate court affirmed correct the trial courts' determination that there was sufficient evidence to support a conclusion establishing the existence of fewer than twelve creditors when the services rendered were to be paid by the management company.

This Court notes that the debtor has introduced into evidence several checks made out to various trade creditors by the Chapter 7 trustee who had been appointed during the debtor's voluntary petition.[2] Apparently, the debtor provided these items in the belief this would be evidence the creditors paid off by the trustee were claim holders. This Court does not find this to be probative evidence, as these checks were written after the involuntary petition was filed. The actions of the Chapter 7 trustee after the involuntary petition was filed have no value for determining who held a claim against the debtor as of the date of the involuntary petition.

At the fact finding hearing, ALI produced uncontradicted testimony that most, if not all of the day-to-day operations of Cold Harbor Shopping Center were handled by Drucker &

---

Court to *sua sponte* conduct a hearing on an issue not in contention.

2. Even though the involuntary Chapter 11 petition had been filed, an order for relief under that Chapter had not yet been entered. Consequently, when Cold Harbor filed the voluntary Chapter 7 petition, the United States Trustee, pursuant to

11 U.S.C. § 701, appointed an interim Trustee to operate the debtor's business, including the collection of rents and payment of any charges incurred on behalf of Cold Harbor, until the decision was reached on the Chapter 11 involuntary relief request. The trustee was subsequently discharged of his trust after the order for relief was entered in the Chapter 11 proceeding.

Falk, a management company that would be considered an insider under § 101(31)(F). An agent of Drucker & Falk handled all of the contract negotiations with service providers for the property and all invoices were submitted to the management company. Furthermore, payments to these creditors were made via a procedure purely internal to Drucker & Falk, with the monies for payment coming from one of the management company's general accounts, to pay the obligations of a number of managed properties including Cold Harbor. Based upon this evidence, this Court finds that unless the contract for services from one of these creditors specifically and clearly identifies the debtor, Cold Harbor Associates, L.P., as the party obligated to pay the bills, the debts will be considered not to be claims against the debtor for § 303(b) counting purposes. The Court now turns to the task of evaluating the evidence as to each specific alleged claim holder.

■ Hanover County Public Utilities is alleged to hold a claim for water and sewer services in the amount of $1,025.83. The Summary of Account Activity provided to the Court, as evidence of this claim, merely bills the service address of 100 "Cold Harbor Ctr". It does not disclose what party actually contracted for the services rendered or if the identity of the shopping center property owner was ever revealed to the utility. Because there is no evidence linking Cold Harbor Associates, L.P. to this bill, this Court finds that the Hanover County Public Utilities does not qualify as a claim holder.

■ Tes Lawn Service is alleged to hold a claim against the debtor in the amount of $800 for routine maintenance done on the property of Cold Harbor Shopping Center. The contract by which Tes Lawn Service was employed clearly states that the agreement is between Tes and Cold Harbor Associates. The Court finds that this is sufficient evidence to demonstrate that Tes held a claim against the debtor and not the management company.

■ Metro Regional Security is alleged to hold a claim against the debtor in the amount of $300 for security services rendered. The materials submitted to this Court, however, show merely that Metro Regional Security submitted a bill to Drucker & Falk for work done at the Cold Harbor Shopping Center. Whether Metro Regional Security was advised that it was performing services for the separate legal entity Cold Harbor Associates L.P. is not apparent. Therefore, this Court finds that Metro Regional Security did not hold a claim against the debtor.

■ Virginia Power Company is alleged to hold a claim against the debtor in the amount of $545 for electric power usage. Although the bills were sent to Drucker & Falk, they quite clearly state that they are charges to Cold Harbor Associates, L.P. Based upon this evidence, this Court finds that Virginia Power held a claim against the debtor.

■ Executive Maintenance is alleged to have held a claim against the debtor in the amount of $450 for janitorial services rendered. The contract letter and billing statements from Executive Maintenance are addressed to "Cold Harbor Shopping Center c/o Drucker & Falk", which is not the correct legal entity. However, the acceptance line signed by Mr. Thomas of Drucker & Falk states that his signature is on behalf of Cold Harbor Associates, L.P. The Court finds that this is specific enough to alert the creditor to the fact that they were actually dealing with the debtor in this case, and accordingly this Court holds that Executive Maintenance held a claim against the debtor.

■ The debtor alleges that National Security held a claim against it in the amount of $300 for security services. However, there is no indication on the contract or the invoices submitted by National Security that would indicate that the creditor knew the legal entity of Cold Harbor Associates, L.P. was in any way involved. The client is listed as Cold Harbor Shopping Center, and the bills are addressed to the shopping center and not to the partnership. This Court finds that this is insufficient evidence to hold that National Security held a claim against the debtor.

■ The debtor has provided a bill from the County of Hanover for real estate taxes on property listed as Cold Harbor Village Center in the amount of $5,624.31. Although the bill in its pre-printed form makes refer-

ence to an owner of record, it does not list any legal entity in that capacity. This Court presumes that the taxing authority in question would refer to the Land Records books to determine the identity of any owner of record, and absent any evidence that Cold Harbor Associates' deed for the property was incorrectly or fraudulently recorded this Court finds that the tax assessment was against the partnership. This Court holds this to constitute a valid claim against the Debtor.

■ Rosewood Glass Company is alleged to have held a claim against the debtor in the amount of $954.44 for boarding up some windows. However, the contract documents make no mention of Cold Harbor Associates L.P. As has been previously noted, this Court finds that evidence that a creditor dealt with Cold Harbor Shopping Center through Drucker & Falk is insufficient evidence that it knew that it was dealing with the debtor. Therefore, this Court finds that Rosewood Glass did not hold a claim against the debtor.

■ The debtor claims that it was indebted to Richmond Newspapers, Inc. in the amount of $649.23 as of the date of the initial petition. However, the evidence submitted by the debtor on this issue leads this Court to a different conclusion. Richmond Newspapers sent amalgamated bills for advertising on several properties to Drucker & Falk. It listed Cold Harbor Shopping Center on the bills, along with several other properties which Drucker & Falk managed. There is no indication anywhere on the invoice that Richmond Newspapers was informed that it was dealing with Cold Harbor Associates, L.P. Therefore, this Court finds that Richmond Newspapers cannot be considered to have held a claim against the debtor as of the date the involuntary petition was filed.

■ The debtor also lists Hill Electrical as a creditor in the amount of $141 for electrical work. The work order presented as evidence of this debt owed by the debtor is utterly devoid of any mention of Cold Harbor Associates, L.P. It is instead directed to Drucker & Falk, with the job location entry having been filled out as "Mechanicsville Seafood", a tenant of the debtor. From this evidence the Court finds that Hill Electrical cannot be considered a claim holder.

■ Although the question has been raised about the propriety of Maloney, Yeatts & Barr acting as counsel in the current case and their position as a pre-petition creditor, until there is an unappealable final order in this case the debtor is not technically bankrupt. Therefore, any questions about the potential conflicts inherent in acting as counsel to a debtor while maintaining the position of a creditor in the same case are premature at this time. As the evidence presented at the factual hearing established that Maloney, Yeatts & Barr was aware that Cold Harbor Associates, L.P. was their client, this Court finds that it held a claim for § 303(b) purposes.

### The Tenants

■ The debtor contends that the tenants of its shopping center should be considered creditors for § 303(b) purposes by virtue of the rental security deposits they provided to the debtor when they initially leased space in Cold Harbor Shopping Center. For the following reasons, this Court finds that the shopping center tenants did not hold claims against the debtor as of the date of the initial petition by virtue of their security deposits.

Although the lease documents between the debtor and the tenants allow the debtor to place the security deposits into its general accounts, this does not change the ownership of the monies in question or limit the scope of this Court's inquiry. The nature of the relationship between the debtor and the tenants and whether the tenants may qualify as creditors is a question governed by the law of Virginia. "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Unlike several other states, Virginia does not have a specific statute detailing the rights and duties of a commercial landlord and tenant with respect to a security deposit. However, the Virginia Supreme Court has determined that a security deposit should be considered the property of the tenant if it is merely held by the

landlord until such time as the landlord might become entitled to the funds through some default by the debtor. "It [the security deposit] was at all times the property of the plaintiff, to be recovered back or paid over to him in the event that all covenants of the lease should be duly performed and *to be forfeited by him only in the event of a breach of any said covenants." Jones v. Dokos Enterprises,* 233 Va. 555, 357 S.E.2d 203, 206 (1987) citing *Nemtzoff v. Vagnier,* 163 N.Y.S. 1075 (Sup.Ct.N.Y.1917) (emphasis added). Under state law as announced by the Virginia Supreme Court, until he defaults on his lease terms, a commercial tenant continues to have a full ownership interest in his security deposit, and does not merely hold a right to repayment.

Other bankruptcy courts confronted with similar circumstances have concluded that a tenant is not a creditor solely due to the existence of his security deposit. *In the Matter of Wayco, Inc.,* 947 F.2d 1330 (7th Cir.1991) (trustee not entitled to security deposit because title to money remains in tenant); *Empire Financial Services, Inc. v. Gingold,* 170 B.R. 736 (Bkrtcy.N.D.Ga.1993) (security deposits not part of the debtor's estate due to Georgia statute requiring deposit to be held in trust for tenant). Tenants have been held to hold no claim of any kind, and have even been precluded from voting in the Chapter 11 plan confirmation process. "A party to a lease is considered a 'creditor' who is allowed to vote ... only when the party has a claim against the estate that arises from *rejection* of a lease." *In the Matter of Greystone III Joint Venture,* 995 F.2d 1274, 1281 (5th Cir.1991) (emphasis in original); *In re Boston Post Road Ltd. Partnership,* 21 F.3d 477 (2nd Cir.1994); *In re Duval Manor Associates,* 198 B.R. 94 (Bankry.E.D.Pa.1996). The debtor argues that the law of this district holds that security deposits create a creditor-debtor relationship between the tenant and landlord. Cold Harbor points to a similar case in which the Bankruptcy Court determined that tenant claims against the bankrupt estate would not be considered *contingent* as to liability. *In re Sundown Associates,* 150 B.R. 156 (Bkrtcy. E.D.Va.1992). However, the debtor's reliance on *Sundown* is misplaced. The question in that case was not whether the tenants

held claims, but rather whether the claims would be considered contingent. The debtor believes that by treating the tenant's security deposits as potentially contingent claims, the bankruptcy court had to have determined in the first instance that they were claims. It is not apparent from the text of *Sundown* that the Court considered, or was even presented with the argument that tenants simply are not creditors by virtue of their security deposits. This Court will not presume that resolution of this issue has already been made in the backhanded manner that the debtor posits.

Because the law of Virginia as announced by the highest court of the Commonwealth holds that security deposits remain entirely the property of a tenant until such time as it violates a covenant in the lease agreement, the monies in question are not debts owed by Cold Harbor. Instead they are the money of another temporarily held by the debtor, and as such do not give rise to a creditor-debtor relationship. Based upon these findings, this Court holds that none of the shopping center tenants can be considered to have held claims against the debtor as of November 4, 1994.

### The Promissory Notes

Cold Harbor introduced evidence which it argued demonstrated the existence of several claims against itself in the form of promissory notes held by its own limited partners. At the outset, the Court notes that none of the parties holding these purported promissory notes would be considered insiders under 11 U.S.C. § 101(31)(C), so whether this proffered obligation actually does represent a claim against the debtor will depend upon whether the noted created a debt or equity relationship. This Court is, however, disturbed by the extreme lateness with which these claims have been advanced. Although there is no doubt that the management of Cold Harbor either knew or should have known of a loan arrangement it had made with its own limited partners, the existence of this alleged debt was not raised until one and a half years after the commencement of this case. However, despite these troubling circumstances, the language of the remand order compels this Court to deal with this issue on the merits.

Each note is virtually identical in form with the only variations being the identity of the note holder and the amount owed on each note. The terms of the notes are as follows:

FOR VALUE RECEIVED the undersigned promises to pay to the order of Matilda J. Smithers [the note holder], ON DEMAND, the sum of Three Thousand Five Hundred Eighty & 08/100 Dollars ($3,580.08) plus interest at the rate of Six Percent (6%) per annum, beginning August 1, 1992, said interest to compound annually if not paid.

If any default be made in the performance of any provision of this contract between the parties, the entire unpaid principal sum and accrued interest shall at once become due and payable without notice at the option of the holder thereof. Failure to exercise this option upon any default shall not constitute or be construed as a waiver of the right to exercise the said option in the event of any subsequent default.

This note is given without offset, for value received, and the maker or makers, endorser or endorsers, hereby waive protest, presentation, demand and notice of extension as to this obligation, and in the event of default the maker further agrees to pay all expenses incurred in collection and/or reducing to judgement the above obligation, including a reasonable attorney's fee.

The notes are dated August 12th, 1992, but were not actually drawn up and delivered to the note holders until March 30th, 1993 or later. Cold Harbor borrowed a total of approximately $63,000 from its partners, who each contributed an amount directly in proportion to his ownership interest in the partnership. The money collected was used to pay off an outstanding mortgage held by Crestar Bank which was secured by the unimproved properties of Cold Harbor.

ALI argues that this Court should recharacterize this group of transactions, evidenced by the promissory notes and hold the purported loans to have been contributions to equity. ALI claims that the nature of these notes and the circumstances surrounding their issuance more properly display the earmarks of an equity exchange between a partner and partnership rather than a debt exchange between a creditor and debtor. This Court agrees with ALI and as explained hereafter holds that none of the alleged debts purportedly evidenced by the promissory notes qualify as holders of claims for the purposes of § 303(b).

In connection with this issue, ALI has raised the doctrine of equitable subordination to buttress its claim that the alleged loans evidenced by the promissory notes are in fact equity. Under 11 U.S.C. § 510(c)(1) the Bankruptcy Court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest...." As part of this argument, ALI has pointed to cases in which this doctrine has been used to treat debts as equity and subordinate the claims to those of other creditors. *Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),* 200 B.R. 996 (Bankr.N.D.Ill. 1996); *Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.),* 186 B.R. 919 (Bankr.E.D.Tenn. 1995). Cold Harbor has vigorously argued that the circumstances of the instant case does not justify equitable subordination, a remedy which they assert is to be reserved only for unusual and extraordinary circumstances. *Ford v. Feldman M.D., P.A. (In re Florida Bay Trading Co.),* 177 B.R. 374 (Bankr.M.D.Fla.1994). Specifically, the debtor claims that equitable subordination requires some form of inequitable conduct on the part of the claim holder to justify recasting their valid debt as equity. *See e.g. In re Fett Roofing and Sheet Metal Co., Inc.,* 438 F.Supp. 726 (E.D.Va.1977) (corporation mere instrumentality or alter ego of lender), *In re ASI Reactivation, Inc.,* 934 F.2d 1315 (4th Cir.1991) (equitable subordination inappropriate when no evidence of misconduct by principal of debtor). However, the Supreme Court has not reached a conclusion as to whether creditor misconduct is or is not required to support equitable subordination. *United States v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). In addition, the debtor argues that equitably subordinating the claims of the promissory note holders would be an empty act in the present circumstances. Cold Harbor claims that

even if the debts were equitably subordinated, the note holders would still hold valid claims, because all equitable subordination does is reorder creditor priority. *Tennessee Valley Steel,* 186 B.R. at 923; *80 Nassau Associates v. Crossland Federal Savings Bank (In re 80 Nassau Associates),* 169 B.R. 832 (Bankr.S.D.N.Y.1994); *Ford v. Feldman, M.D., P.A. (In re Florida Trading Co.),* 177 B.R. 374 (Bankr.M.D.Fla.1994). Although the debtor is correct that equitable subordination would not eliminate the claims from consideration, this Court believes the debtor has misconceived ALI's assertion. ALI is not claiming that the debts at issue should be equitably subordinated, instead ALI asserts that the claims of the note holders were actually equity contributions *ab initio.* Rather than recharacterizing the exchange from debt to equity, or subordinating the claim for some reason, the question before this Court is whether the transaction created a debt or equity relationship from the outset.

 This Court is not required to accept the label of "debt" or "equity" placed by the debtor upon a particular transaction, but must inquire into the actual nature of a transaction to determine how best to characterize it. *Celotex Corporation v. Hillsborough Holdings Corporation (In re Hillsborough Holdings Corporation),* 176 B.R. 223 (M.D.Fla.1994). In determining from the evidence available to it that a transaction called a loan by the debtor is actually more properly called a contribution to equity, this Court may recharacterize the alleged loan to reflect the true nature of the transaction. *Matter of Herby's Foods, Inc.,* 2 F.3d 128 (5th Cir. 1993); *Herzog v. Leighton Holdings, Ltd.,* 200 B.R. 996 (Bkrtcy.E.D.Ill.1996); *Tennessee Valley Steel Corporation v. B.T. Commercial Corporation (In re Tennessee Valley Steel Corporation),* 186 B.R. 919 (Bkrtcy. E.D.Tenn.1995). This power stems from the authority vested in the Bankruptcy Court to use its equitable powers to test the validity of debts. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

 The primary factor this Court is to consider when evaluating whether funds advanced by a shareholder are the result of an equity contribution or a loan is whether the transaction bears the earmarks of an arm's length negotiation. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Roth Steel Tube Co. v. Commissioner of Internal Revenue,* 800 F.2d 625 (6th Cir. 1986). The more such an exchange appears to reflect the characteristics of such an arm's length negotiation, the more likely such a transaction is to be treated as debt. To aid in analyzing such transactions, Courts have identified several factors which help identify the distinctions between a loan and an equity contribution. The list of factors is not exclusive, and no one factor is predominant, nor are the factors to be given rigidly equal weight. Instead, this Court is to apply these factors to the particular case at hand keeping in mind the specific circumstances surrounding the present factual situation. One Court listed the factors to be considered as including:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) 'thin' or inadequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek postponement.

*Celotex Corporation v. Hillsborough Holdings Corporation (In re Hillsborough Holdings Corporation),* 176 B.R. 223, 248 (M.D.Fla.1994); *See also In re Lane,* 742 F.2d 1311 (11th Cir.1984); *Estate of Mixon v. United States,* 464 F.2d 394 (5th Cir.1972). The Sixth Circuit has listed a slightly different, but in many respects very similar catalogue of factors to consider when evaluating

whether the transaction was made at arm's length. Just as the *Celotex* Court did, the Sixth Circuit highlighted factors including identity of interest between creditor and stockholder, adequacy or inadequacy of capitalization, the source of repayments, the name given instruments evidencing indebtedness, presence or absence of fixed maturity date and schedule of payments, presence or absence of a fixed rate of interest and interest payments, inability to obtain outside financing, subordination of advances, presence or absence of a sinking fund, and the extent to which the advances were used to acquire capital assets. Additionally, the Sixth Circuit found the presence or absence of security for the purported loan to be an important factor which should be considered. *Roth Steel Tube Company v. Commissioner of Internal Revenue*, 800 F.2d 625, 630–32 (6th Cir.1986). A reading of the two lists of factors together highlights a few main themes that demarcate the distinction between loans and equity contributions in these situations. A critical group of factors concern the formality of the alleged loan agreement. The more specific and complete the parties are in identifying and codifying the terms of the alleged loan agreement, the more like a loan the transaction appears. By contrast, if the terms of such an agreement are vague and non-specific, such a transaction appears more like a shareholder contributing capital to keep his investment afloat. A second important group of factors relate to the financial situation of the corporation at the time the purported loan is made. If investing in the corporation appears to have been especially risky (e.g. it was thinly capitalized), or the source of funds to repay the loan is not made clear, then the transaction has more of the earmarks of an equity contribution. An additional group of factor in this category is the relationship between the limited partners equity ownership and the parties' participating in the making of the loan, reflected by the concern over whether there is identity between the equity holders and the alleged lenders, and whether control of the corporation is dependent upon the loan in question.

 Applying these factors to Cold Harbor's shareholders/promissory note holders, this Court finds that the notes in question most properly reflect an equity contribution rather than a loan. One of these factors is clearly inapplicable to the present case: the failure of the debtor to repay on the due date or seek postponement. Simply put, because the notes are demand notes with no defined due date, and no demand appears to have been made, there is simply no evidence one way or another that would aid this Court in determining the nature of the transactions. The Court will now identify and analyze those factors which led to this determination, beginning with those factors which weigh in favor of finding the transaction in question to have been a loan.

1. *The names given to the certificates evidencing the indebtedness, and the intent of the parties.* These analysis for these two factors is generally similar, and the Court will deal with them together. First, the notes given by Cold Harbor to their shareholders are quite clearly marked as "Promissory Notes". Labeling the documents in this way is some evidence that the transaction was in fact a loan. Labeling the documents in this manner also sheds light on the intent of the parties, demonstrating that they believed that they were lending money to the partnership. The debtor also introduced deposition evidence that the note holders thought they had made a loan. These pieces of evidence cannot be regarded as conclusive, or even particularly strong evidence, as placing significant weight on the label given to the transaction by the parties would have the effect of rendering moot much of the inquiry into the nature of the transaction. This Court is also very concerned with the approximately seven month delay between the transfers and the drawing and delivery of the notes, which raises doubts in this Court's mind as to whether the parties determined what they wanted to call the transaction until well after the actual exchange. The lack of a promissory note, in conjunction with a lack of other formalities, may indicate that advances are equities. *Estate of Mixon v. United States*, 464 F.2d 394, 403 (5th Cir.1972). Although there are promissory notes in the present case, the extreme delay in delivery indicates a troubling lack of formalities. The delay also casts doubt upon the actual intent of the parties at the time of the transaction,

and whether the deposition testimony given nearly four years after the transactions took place accurately represents the parties' intent when the transactions took place. Therefore, while the name given to the documents by the parties does weigh in favor of holding the transactions to be loans, and there is some evidence that the parties' intended the advances to be loans, the extended delay between the transactions and the delivery of the notes creates doubt in the Court's mind as to whether the notes do in fact reflect the parties' understanding. Given this doubt, the Court finds that the weight which should be given to this factor is limited due to this delay and other factors that follow.

2. *The right to enforce payment of principal or interest.* Unlike equity holders, debt holders have the right to enforce repayment under the terms of their note. The notes in question are styled as demand notes, payable to the holder upon his request. In addition, the note holders are entitled to attorney's fees in the event of a default on Cold Harbor's part. The note holders' right to enforce payment, and extract a penalty from Cold Harbor in the event of a failure on its part constitutes evidence weighing in favor of considering the advances to be loans rather than equity.

3. *Participation in management flowing as a result.* One characteristic of equity is the right to participate in ownership decision making. If the shareholder obtains additional rights to control the actions of the corporation as a result of lending it money, then the transaction will be viewed as having the characteristics of equity. In this case, however, there has been no evidence that the shareholders gained additional ownership rights based upon the loan, or that their degree of control was dependent upon their advancing these funds. On the other hand, this state of affairs stems primarily from the fact that the loan was made pursuant to a *pro rata* contribution arrangement based upon the lenders' original equity ownership. Given that all of the original equity holders contributed in amounts relatively equal to their original capital investment, it is not surprising that the nature of the parties' ownership interests did not change. For this reason, this Court attaches little weight to this factor.

4. *"Thin" or inadequate capitalization.* There was no evidence presented that would relate to this factor. Generally this factor is relevant when a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation, and thus the relevant time for determining whether capitalization was adequate is generally at the corporation's creation. *See e.g. Hillsborough* 176 B.R. at 249. However, given the long duration between the inception of the partnership and the loan made in this case, this factor is not particularly relevant to the issue at hand. In the absence of contrary proof, this Court assumes that Cold Harbor was adequately capitalized when it was formed, and therefore, to the extent that it might be relevant, this factor would weigh in favor of holding the transactions more likely to have been loans.

These four factors tend to show that the advances from the limited partners to Cold Harbor exhibited some of the formalities associated with a loan. The purpose of the inquiry into the nature of the transaction is to determine if it is one which could have been made at arm's length. This Court finds that the following factors establish that the advances made by Cold Harbor's shareholders should be considered equity contributions, and not loans. For these reasons, the promissory notes in question do not count for § 303(b) purposes.

1. *The presence or absence of a fixed maturity date, a schedule of interest payments, a sinking fund.* Although Court's have treated these as separate factors in their analysis, they are significantly related. The basic question asked when addressing these factors is: how definite were the plans for repayment. If the terms are vague and nonspecific, then the advance takes on the appearance of equity as it is assumed that a non-shareholder bargaining at arm's length would demand specifics and formalities to protect their investment. First, the absence of a fixed maturity date, indicates that advances are capital contributions and not loans. *Roth Steel Tube,* 800 F.2d at 631; *Lane v. United States,* 742 F.2d 1311 (11th Cir.1984). The notes given by Cold Harbor

have no maturity date, simply being termed demand notes, and absence of scheduled periodic interest payments also demonstrates that an advance is capital and not a loan. *Roth Steel Tube*, 800 F.2d at 631; *Stinnett's Pontiac Service, Inc. v. Commissioner*, 730 F.2d 634 (11th Cir.1984). Although there is a defined rate of interest on the face of the notes, no provisions have been made for the payment of interest payments prior to a demand for repayment in full by a shareholder. An open ended repayment term such as this tends to demonstrate that the advances in question bear the earmarks of an equity contribution. By the terms of the notes, they were to pay 6% interest per annum until they were redeemed by the note holders. This Court takes judicial notice that the Prime Rate on August 12, 1992 when the notes were originated, was also 6%. *Money Rates,* The Wall St. J., August 12, 1992 at C19. This Court finds implausible that a lender engaging in an arm's length negotiation would advance money at the Prime Rate on an unsecured demand note to an entity that had defaulted on an obligation of approximately $1,475,000 just four months before. Finally, there is no evidence that the debtor ever even considered establishing a sinking fund to provide for the repayment of the advances. Failure to establish a sinking fund for repayment is evidence that advances are capital contributions rather than loans. *Roth Steel Tube*, 800 F.2d at 632. This Court finds that formalities evidencing a method of repayment to either be nonexistent, or so vague as to be virtually nonexistent. An advance made for such little return on a risky investment with so little regard for the method of repayment strongly suggests that the transaction was not made on an arm's length basis, and does not bear the earmarks of a loan.

2. *The extent to which the advance was used to acquire capital assets.* Use of advances to meet the daily needs of an organization is indicative of a loan and not an equity contribution. *Roth Steel Tube,* 800 F.2d at 632. Conversely, the use of advances to acquire capital assets may indicate that the advances had the nature of a capital contribution. *In re Hillsborough,* 176 B.R. at 249. The testimony at the factual hearing established that the funds advanced in this case were used to pay off a loan from Crestar bank which had been secured by the unimproved properties adjacent to the shopping center building. Therefore, the funds were used to purchase a capital asset by eliminating a lien on real estate, and this factor further convinces this Court that the advances were in fact equity contributions.

3. *Presence or absence of security.* Although security was available in the form of the unimproved parking lot properties, the notes purport to be a wholly unsecured loan from the limited partners. Lack of security for a transaction is considered to be a significant indicator that an advance is not a loan. *Roth Steel Tube,* 800 F.2d at 631. This Court considers the complete lack of security to be strong evidence that the transaction was not made at arm's length, and that the advances were capital contributions instead of loans.

4. *Inability to obtain outside financing.* The question to be asked here is whether a reasonable outside creditor would have made a loan to the debtor on similar terms. *Roth Steel Tube,* 800 F.2d at 631. This Court does not hesitate to hold that the answer to this question is an unequivocal "no". There was no security given, the loan repayment schedule was nonexistent, and the notes were not delivered for many months after the transaction, just to name a few of the circumstances that would dissuade an outsider from doing business in the same manner as the partners have done. In addition, the sloppiness of drafting the notes, such as the presence of an acceleration clause on a demand note, demonstrates a lack of formality that no outside creditor would accept. These provisions, or lack thereof, in the transaction convince this Court that the advances were not made as a result of arm's length bargaining, and hence cannot be considered loans.

5. *Identity of interest between creditor and stockholder.* The final factor to be considered is the relationship between those owning equity and making the advance. This Court considers this to be the most critical factor in its determination due to the exact identity between the two groups. The purported loan was made on a *pro rata* basis, with each partner contributing a percentage

of the entire advance exactly equal to his or her equity interest in the partnership. "If advances are made by stockholders in proportion to their respective stock ownership, an equity contribution is indicated.... A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is, however, strongly indicative that the debt is bona fide." *Roth Steel Tube,* 800 F.2d at 630 (quoting *Estate of Mixon,* 464 F.2d at 409). Where there is an exact correlation between the ownership interest of the equity holders and their proportionate share of the alleged loan, this Court believes this evidence standing alone is almost so overwhelming that the advance was in fact a capital contribution to equity and not a loan that coupling this with the complete lack of formality evidenced by the records of the transaction this Court is convinced that holding the advances to be equity is correct.

Weighing the various factors, this Court finds that the evidence is predominantly in favor of treating the advances as equity. Although the transactions did have some of the characteristics of a debt transaction, the factors that would favor that conclusion are generally weak. On the other hand, the factors that point to the conclusion that the notes represent an equity investment by the limited partners are quite strong. In light of these determinations, this Court holds that the promissory notes held by the limited partners do not represent a claim against Cold Harbor for the purposes of § 303(b).

### Conclusion

This Court holds that Cold Harbor had six creditors for § 303(b) purposes as of November 4, 1994. Specifically those creditors were: ALI, Tes Lawn Service, Virginia Power Company, Executive Maintenance, the County of Hanover, and Maloney, Yeatts & Barr. None of the other alleged trade creditors were sufficiently well documented for the Court to find that they were creditors of Cold Harbor. In addition, for the reasons stated above, this Court holds that the shopping center tenants, and the limited partner note holders did not hold claims under

§ 303(b) at the time the involuntary petition was initially filed.