*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0378P (6th Cir.)
File Name: 01a0378p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

In re: AUTOSTYLE PLASTICS, INC.,

>   *Debtor.*

————————————————

BAYER CORPORATION,

>   *Plaintiff-Appellant,*

>   *v.*

MASCOTECH, INC.; CITICORP VENTURE CAPITAL, LTD.; and THE TREASURER OF THE STATE OF MICHIGAN, as custodian of several state retirement systems,

>   *Defendants-Appellees.*

No. 00-1102

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00800—Gordon J. Quist, District Judge.

Argued: March 6, 2001

Decided and Filed: October 22, 2001

1

Before:  KRUPANSKY and BOGGS, Circuit Judges; and
TARNOW, District Judge.

————————

**COUNSEL**

**ARGUED:**  William E. Kelleher, Jr., COHEN & GRIGSBY, Pittsburgh, Pennsylvania, for Appellant. Joel D. Applebaum, PEPPER, HAMILTON & SCHEETZ, Detroit, Michigan, for Appellees. **ON BRIEF:**  William E. Kelleher, Jr., COHEN & GRIGSBY, Pittsburgh, Pennsylvania, Thomas D. Maxson, ECKERT SEAMANS CHERIN & MELLOT, Pittsburgh, Pennsylvania, for Appellant.  Joel D. Applebaum, PEPPER, HAMILTON & SCHEETZ, Detroit, Michigan, for Appellees.

————————

**OPINION**

————————

BOGGS, Circuit Judge.  This complex case concerns a reasonably simple issue:  the relative priority of claims to the proceeds of a bankruptcy estate.  Plaintiff Bayer Corporation ("Bayer") appeals the bankruptcy court's judgment, affirmed by the district court, granting summary judgment to defendants, MascoTech, Inc. ("MascoTech"); Citicorp Venture Capital, Ltd. (CVC or Citicorp); and the Treasurer of the State of Michigan, as custodian of several state retirement systems (SMRS) (collectively "the defendants"), in this adversary action relating to the bankruptcy of AutoStyle Plastics, Inc. ("AutoStyle").  Both the district court and the bankruptcy court concluded that the defendants' claims have priority over Bayer's claim.  For the following reasons, we affirm.

————————

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. Procedural History

Before reviewing the facts, we will briefly review the procedural history of this case, which explains how this inter-creditor dispute between Bayer and the defendants developed within the context of AutoStyle's bankruptcy proceeding. On June 3, 1996, AutoStyle filed a Chapter 11 petition with the bankruptcy court. On June 7, 1996, the bankruptcy court entered an order authorizing the lease and sale of all personal property of AutoStyle, including machinery and equipment that served as collateral for Bayer's security interest, to Venture Industries Corporation ("Venture"). On July 30, 1996, AutoStyle's Chapter 11 case was converted to Chapter 7.

On September 17, 1996, the bankruptcy court entered a Consent Order Providing Adequate Protection and Other Relief that directed Venture to pay its monthly lease payment of $257,000 directly to CIT Group/Credit Finance, Inc. (CIT), rather than to Bayer. CIT had a perfected first-priority security interest in all of AutoStyle's assets. The loans that CIT made to AutoStyle through its credit facility had been repaid by this time; however, certain loans made by the defendants pursuant to participation agreements in the credit facility had not been repaid. It is because of these participation interests that the bankruptcy court ordered payment by Venture to CIT, rather than to Bayer. Bayer acknowledges CIT's first-priority status, but contends that the defendants' participation agreements are subordinate to Bayer's lien position.

On February 27, 1997, Bayer filed a Motion for Adequate Protection Directing Trustee to Make Rental Payments to Bayer Corporation ("Motion for Adequate Protection") in the United States Bankruptcy Court for the Western District of Michigan. Bayer asserted that it has a security interest in certain machinery and equipment of AutoStyle that is second in priority to CIT's security interest and ahead of the defendants' participation interests. Bayer argued that CIT's secured interest was paid in full and that rental payments

should be directed to Bayer as the holder of the next secured interest following CIT. The bankruptcy court agreed to treat Bayer's motion as an adversary proceeding.

After several telephonic status conferences and scheduling orders and extensive discovery, the parties filed cross-motions for summary judgment. On December 31, 1997, the bankruptcy court issued its first opinion, granting, in part, the defendants' motion for summary judgment and denying Bayer's motion for summary judgment. The court granted the defendants summary judgment as to Bayer's contention that the defendants' claims be equitably subordinated to Bayer's claim. The court ruled that it did not have jurisdiction to address Bayer's argument that the defendants' participation agreements be recharacterized from debt to equity. Finally, the court did not reach a decision as to whether the defendants' participation agreements with CIT were valid. Instead, the court required the defendants to show evidence that they provided payment to CIT for their participation interests. The defendants complied with the bankruptcy court's requirement.

On July 14, 1998, the bankruptcy court issued a supplemental opinion, finding that the participation agreements were valid and reaffirming its December 31, 1997 opinion. Bayer appealed. On May 25, 1999, the district court affirmed the bankruptcy court's opinion with respect to all issues except Bayer's claim that the defendants' alleged debt should be recharacterized as equity. The district court ruled that the bankruptcy court had jurisdiction to address this issue and remanded it to the bankruptcy court.

On remand, acting at the defendants' suggestion, the bankruptcy court agreed to review the record and the previously filed briefs to determine whether the recharacterization issue could be decided without further hearing. On August 18, 1999, without further hearing, the bankruptcy court issued an opinion rejecting Bayer's recharacterization claim. On December 16, 1999, the district

no evidence, however, indicating that the funds from the participation agreements were actually used for this purpose or for any other capital assets, rather than as working capital. Therefore, this factor weighs toward debt.

### 11. The Presence or Absence of a Sinking Fund to Provide Repayments

The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans. *Ibid.* The bankruptcy court noted the absence of a sinking fund and concluded that this factor weighed toward equity. We agree with the district court, however, that "the loans were secured with liens, which obviated any need for a sinking fund." Therefore, we conclude that this factor only slightly weighs toward equity, if at all.

* * *

Bayer is unable to demonstrate a single factor that weighs strongly toward recharacterizing the participation loans as equity. The closest it can come are several factors that lean only slightly toward equity, namely the source of repayments and the absence of a sinking fund, and one factor about which there is disputed evidence, the adequacy of capitalization. Given that the other eight factors all weigh toward debt to a greater or lesser extent, Bayer presents insufficient evidence to withstand summary judgment as to this issue.

### V. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

### 9. The Extent to Which Advances Were Subordinated to Claims of Outside Creditors

Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans. *Id.* at 631-32. We believe that this factor weighs slightly toward the advances being a loan. The defendants' claims were subordinated within the credit facility to CIT and to the other participants in the loan, which included several other lenders exclusive of the defendants. In other words, as AutoStyle repaid CIT for money it lent through the credit facility, CIT and the other loan participants would be paid first and after they were fully repaid, the defendants would be repaid for their participations. The defendants' agreement to subordinate their claims *within the credit facility* was only as a condition of their participation agreements with CIT. The advances were not subordinated to the claims of all of AutoStyle's creditors, nor were they subordinated pursuant to any agreement between the defendants and AutoStyle. This is strongly indicative of debt. However, we also believe that the fact that the defendants agreed to subordinate their participations to CIT and the other loan participants – a major concession on the part of the defendants – is also a slight indication of equity. Therefore, we cannot give full weight to this factor as being indicative of a loan.

### 10. The Extent to Which Advances Were Used to Acquire Capital Assets

Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness. *Id.* at 632. The defendants have presented undisputed evidence that the funds that were actually provided pursuant to the participation agreements were used for working capital that enabled AutoStyle to meet daily operating needs. Bayer relies only on minutes of an AutoStyle Board of Directors meeting that was held prior to the time that any of the participation agreements were signed, in which there was discussion of a need for cash to finance "basic investment in the paint line." Bayer presents

court affirmed the bankruptcy court's decision. Bayer subsequently filed a timely appeal.

## II. Facts

AutoStyle was originally incorporated as C & F Stamping, Inc., in the mid-1960s. Starting in the mid-1970s, AutoStyle began manufacturing plastic parts for the automotive industry. AutoStyle eventually moved into a process known as reaction injection molding, where two or more chemicals are mixed and reacted to form flexible plastic. Bayer was AutoStyle's exclusive supplier of these chemicals. Bayer also provided credit and other financial accommodations to AutoStyle.

On March 16, 1982, AutoStyle entered into a long-term credit facility (also referred to as a revolving-loan agreement) with CIT. The credit facility was secured by a properly and continuously perfected blanket lien on substantially all of AutoStyle's assets. The credit facility was expandable in that it contemplated the possibility of future advances. Specifically, it stated that CIT agreed "[t]hat it will from time to time make advances to [AutoStyle]."

On March 28, 1985, AutoStyle, Inc. was formed. The same day, AutoStyle, Inc. acquired the majority of the outstanding stock of AutoStyle. CVC and SMRS were shareholders of AutoStyle, Inc. CVC owned approximately 35% of AutoStyle, Inc. stock and SMRS owned approximately 16% of AutoStyle, Inc. stock. The remaining 49% of stock was divided between the prior owners of AutoStyle; certain senior management; and Patrick Bailey, for pre-acquisition sales commissions. After the transaction, AutoStyle and AutoStyle, Inc. retained separate Boards of Directors.

On November 18, 1987, AutoStyle and AutoStyle, Inc. held meetings of their Boards of Directors to discuss AutoStyle's cash flow problems. At these meetings, AutoStyle, Inc.'s Board of Directors approved the borrowing of up to $4,000,000 from CVC and SMRS. AutoStyle's Board also recognized that AutoStyle "is in desperate need of $4 million dollars short-term cash." Richard M. Cashin, Jr., a director of

AutoStyle and AutoStyle, Inc. and a senior officer (and later president) of CVC, stated that CVC might be interested in loaning AutoStyle $2 million if it received AutoStyle warrants in connection with the offering. On November 19, 1987, AutoStyle's attorney wrote a letter to Cashin confirming the planned loan to AutoStyle and enclosing a letter agreement regarding the stock warrants and a proposed note from AutoStyle for $2 million. The letter confirmed CVC's intention to wire transfer the funds the next day. There was no indication of participation in CIT's credit facility or a security interest in favor of CVC in either the Board minutes, counsel's letter, or proposed note from AutoStyle to CVC.

This planned direct loan never occurred. Bayer admits that the "[t]he record contains no explanation for why the direct loan was not ultimately documented as such." Instead, the parties entered into a different form of transaction. The record contains a document entitled "Subordinated Participation Agreement" between CIT and CVC ("First Participation Agreement"), whereby CVC paid $2 million to CIT, which allowed CIT to fund additional borrowings by AutoStyle. The First Participation Agreement granted CVC a 100% "subordinated participation" in CIT's credit facility in exchange for the $2 million CVC paid to CIT. CVC would receive repayment only if AutoStyle paid CIT and only after CIT and other loan participants received repayment for their shares of the loan. In addition, AutoStyle signed a separate demand note and CVC received stock warrants directly from AutoStyle, Inc. The defendants state that the additional funding was used by AutoStyle primarily for working capital. This transaction was the first of five subordinated participation agreements that CIT entered with the defendants, with each one expanding the total amount of CIT's credit facility.

On January 12, 1988, SMRS entered into a separate "Subordinated Participation Agreement" with CIT, substantially similar to the participation agreement between CVC and CIT ("Second Participation Agreement"). Pursuant to the agreement, in exchange for $935,252, SMRS was

facility. Therefore, the defendants' participation interests did not exactly correlate to their ownership interests in AutoStyle. The defendants, in a sense, were making a loan to the other AutoStyle shareholders who did not have participation interests in CIT's credit facility. As a result, this factor weighs slightly toward debt.

### 7. *The Security for the Advances*

The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans. *Roth Steel*, 800 F.2d at 631. As has already been discussed at length, the defendants had valid, legal, enforceable participation agreements in CIT's properly secured credit facility, which was secured by a lien on AutoStyle's assets. Therefore, this factor cuts in favor of a loan.

### 8. *The Corporation's Ability to Obtain Outside Financing*

When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans. *Ibid.* Bayer contends that the bankruptcy court improperly concluded that $12.5 million in 1988 loans from PNC Bank and Mellon Bank were from disinterested lenders because the loans were guaranteed by two of AutoStyle's primary suppliers: PPG Industries in the case of the PNC loan and Bayer in the case of the Mellon Bank loan. It is true that the guarantees came from important suppliers, but the fact remains that the financing came from outside lending institutions. That the guarantees were required for the financing does not change this fact. There is no requirement that outside financing come without any involvement of "interested" parties. Therefore, this factor weighs in favor of a loan.

AutoStyle's business, however, this is balanced to some extent by the security of the lien on all of AutoStyle's assets.

### 5. The Adequacy or Inadequacy of Capitalization

Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans. *Id.* at 630. The district court relied on language in *In re Cold Harbor* indicating that the undercapitalization analysis is particularly relevant when "a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation." 204 B.R. at 917. The district court concluded that capitalization was adequate because AutoStyle had operated for more than twenty years before the defendants' loans were made. We agree with Bayer, however, that capitalization is not to be assessed only at initial capitalization. Indeed, the court in *Roth Steel* examined capitalization at the time the transfer was made. 800 F.2d at 630. There is disputed evidence that cuts both ways as to this factor. Bayer presents evidence that AutoStyle was in serious financial straits at the time the defendants entered into the participation agreements and that it had negative working capital for nine straight years, but there is also evidence from the defendants that AutoStyle was obtaining money from disinterested third parties, including Bayer itself, at the time the transfers were made.

### 6. The Identity of Interest Between the Creditor and Stockholder

If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. *Ibid.* On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt. *Ibid.* "Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan . . . this evidence standing alone is almost . . . overwhelming." *In re Cold Harbor*, 204 B.R. at 919. Not all of AutoStyle's shareholders were participants in CIT's credit

granted a portion of CIT's credit facility. SMRS would be repaid under the same terms as CVC: only if AutoStyle repaid the loan and only after CIT and other loan participants were repaid. AutoStyle signed a separate demand note and SMRS received stock warrants. The defendants note that the funding was also used by AutoStyle primarily for working capital.

On March 15, 1988, AutoStyle made a presentation to Bayer, formally asking Bayer to guarantee a proposed $4 million loan from Mellon Bank. At the presentation, AutoStyle provided Bayer a "debt schedule as of January 31, 1987 [sic, 1988]" itemizing AutoStyle's notes payable. The debt schedule described a "Citicorp *bridge loan* with warrants" of $2 million and a "State of Michigan *bridge loan* with warrants" of $935,252 (emphasis added). Bayer states that it was never specifically informed by AutoStyle, CVC, or SMRS, that the $2 million and $935,252 loans were secured by the senior security interests in favor of CIT.

On August 11, 1988, CVC and CIT amended the First Participation Agreement to increase CVC's participation from $2 million to $4.5 million ("Third Participation Agreement"). The defendants state that this money was wire transferred to CIT and permitted CIT to provide additional funding to AutoStyle, which used it primarily for working capital. AutoStyle executed demand notes directly to CIT in connection with this additional funding.

On September 30, 1988, Bayer executed a guarantee to Mellon Bank for a $4 million loan to AutoStyle for it to purchase certain equipment. AutoStyle entered into a Security Agreement granting Bayer a security interest in machinery and equipment, second in priority only to the lien in favor of CIT. The parties signed financing statements that were filed on behalf of Bayer in all required filing locations. Bayer's September 30, 1988 security interest remains perfected today.

The participation interests of CVC and SMRS in CIT's credit facility were disclosed in general terms in AutoStyle's audited 1987-1988 financial statements dated May 31, 1988,

and in all subsequent annual audited financial statements, copies of which were provided to Bayer. These statements do not refer specifically to the participation interests of CVC and SMRS. Instead, they refer to the existence of the CIT credit facility and the fact that CIT and certain AutoStyle "shareholders" had made arrangements for AutoStyle to borrow additional money through the credit facility. In addition, the stated amount of the credit facility was higher in each financial statement. At the time of the September 30, 1988 agreement, SMRS had security interests, other than the participation agreements, in its name. Thinking that it had knowledge of all of SMRS's security interests, Bayer requested that SMRS subordinate those liens and financing statements to those of Bayer and SMRS agreed.

Around the time of Bayer's September 30, 1998 agreement, Pittsburgh National Bank loaned AutoStyle $8.5 million to purchase and install a paint line in AutoStyle's facilities. The loan was guaranteed by PPG Industries, Inc., a principal supplier of paint products to AutoStyle. At about the same time, Bayer directly loaned AutoStyle approximately $1.3 million (which AutoStyle later repaid) to purchase and install a tank farm to house Bayer products.

On November 29, 1988, AutoStyle obtained a "solvency opinion" from Marshall and Stevens. The opinion concluded that AutoStyle's assets exceeded its liabilities, that AutoStyle could pay its liabilities as they came due, and that AutoStyle was adequately capitalized. Shortly after the release of the opinion, MascoTech purchased one-half of the common stock of AutoStyle's parent, AutoStyle, Inc., for $10 million and loaned AutoStyle another $26.8 million.

On March 19, 1990, CIT and MascoTech entered into a "Subordinated Participation Agreement," similar to the CVC and SMRS agreements. There was a slight difference in that MascoTech agreed to purchase, on demand from CIT after AutoStyle's default or at any time sooner at MascoTech's option, a $1.5 million participation interest in the CIT facility ("Fourth Participation Agreement"). CIT did not make a

demand notes along with a fixed rate of interest and interest payments is more indicative of debt than equity.

### 3. The Presence or Absence of a Fixed Rate of Interest and Interest Payments

The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans. *Ibid.* The agreements included both a fixed interest rate and fixed payments. The defendants were to be paid at 2% over the prime rate "as [CIT] is paid by [AutoStyle]." The defendants subsequently agreed to defer interest payments. At best, Bayer can argue that this factor cuts both ways since the deferral of interest payments indicates the possibility that during the course of the transaction the defendants eventually never expected to get repaid and converted their debt to equity. Still, it does not change the fact that, initially at least, there was a fixed rate of interest and interest payments, indicating that the transaction was originally intended to be debt not equity. *See In re Cold Harbor*, 204 B.R. at 915 (indicating that recharacterization applies to transactions that were equity contributions "*ab initio*"). Morever, the deferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid.

### 4. The Source of Repayments

If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution. *Roth Steel*, 800 F.2d at 631. The bankruptcy court noted that the source of repayment of the defendants' participation interests in the CIT credit facility is identical to the source looked to by CIT for repayment of its portion of the credit facility: AutoStyle's earnings, secured by a lien on all of AutoStyle's assets. We agree with the district court that these facts weigh only slightly in favor of equity. The fact that CIT and the defendants were to be paid out of AutoStyle's earnings indicates that they were dependent on the success of

and (11) the presence or absence of a sinking fund to provide repayments. *Roth Steel*, 800 F.2d at 630. No one factor is controlling or decisive. *Ibid.* The factors must be considered within the particular circumstances of each case. *Ibid.* We note that "[t]he more [a transaction] appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt." *In re Cold Harbor*, 204 B.R. at 915. We will address each of the eleven factors in turn.

### 1. The Names Given to the Instruments

The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans. *Roth Steel*, 800 F.2d at 631. In this case, there are instruments of indebtedness: the five participation agreements that the defendants entered into with CIT. Bayer argues that in relying on these agreements, the bankruptcy court exalted form over substance. We disagree. For the reasons we have already stated, these agreements were valid and enforceable instruments that were evidence of indebtedness.

### 2. The Presence or Absence of a Fixed Maturity Date and Schedule of Payments

The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans. *Ibid.* The bankruptcy court noted that the absence of a set schedule of repayment of principal weighs in favor of equity, but is not dispositive. The district court, however, noted that the participation agreements used demand notes as well as a fixed rate of interest and regular interest payments, which it believed was indicative of a loan. Moreover, the district court stated that rigid application of a rule that the lack of a fixed maturity date and fixed repayment schedule was indicative of equity "would create a per se rule that use of a demand note by an insider would always be indicative of an equity contribution rather than a loan." We agree and therefore conclude that the use of

demand for these funds until October 1996, after AutoStyle filed for bankruptcy, at which time MascoTech paid the $1.5 million under its agreement with CIT.

Also on March 19, 1990, CVC amended the First and Third Participation Agreements by letter agreement with CIT, increasing CVC's participation in CIT's credit facility by $1.5 million ("Fifth Participation Agreement"). The terms of this amendment were similar to those of MascoTech's participation agreement: CVC agreed to purchase, on demand from CIT after AutoStyle's default or any time sooner at CVC's option, a $1.5 million participation interest in the CIT facility. This amount also was not funded until October 1996, after AutoStyle filed for bankruptcy.

These final two participation interests were disclosed in AutoStyle's audited financial statements. MascoTech and CVC paid CIT $3 million under their respective agreements in October 1996, after AutoStyle filed for bankruptcy.

Bayer possesses a total secured claim against AutoStyle in a principal amount of $2,915,379.23, plus other charges. In aggregate, the defendants are owed approximately $8,435,252, consisting of amounts funded pursuant to the participation agreements.

### III.  Standard of Review

This court reviews a bankruptcy court's grant of summary judgment de novo. *See City of Mt. Clemens v. United States Envtl. Prot. Agency*, 917 F.2d 908, 914 (6th Cir. 1990). A bankruptcy court's grant of summary judgment is reviewed with all facts and inferences considered in the light most favorable to the non-moving party. *See In re Julien Co.*, 44 F.3d 426, 429 (6th Cir. 1995). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, this court views the

factual evidence and draws all reasonable inferences in favor of the non-moving party. *See National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *See Klepper v. First Am. Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 342 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

On appeal, Bayer argues that the bankruptcy court erred in granting the defendants' motion for summary judgment. Bayer asserts that its cross-motion for summary judgment should have been granted, or in the alternative, it requests that we reverse the decision granting the defendants' motion for summary judgment and remand this case for trial. Bayer's request complies with decisions of this court that have held that "[t]he fact that both parties make motions for summary judgment . . . does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948) (cited with approval in *Cherokee Ins. Co. v. E. W. Blanch Co.*, 66 F.3d 117, 122 n.4 (6th Cir. 1995)); *see also B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001); *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## IV. Analysis

The dispute in this case turns on whether Bayer or the defendants have a higher priority interest in proceeds from AutoStyle's bankruptcy estate. The parties do not dispute that CIT is first in priority based on its security interest in AutoStyle's assets that was filed after CIT and AutoStyle entered the 1982 credit facility. Bayer argues that it is in line behind CIT – but ahead of the defendants – based upon its security interest in AutoStyle's assets that was filed after the 1988 loan guarantee that Bayer made to Mellon Bank. The defendants argue that, through their participation agreements,

B.R. at 137; *In re Cold Harbor*, 204 B.R. at 915; *In re Hyperion*, 158 B.R. at 561; *In re Fett Roofing*, 438 F. Supp. at 729-30.[11]

We turn then to the eleven *Roth Steel* factors.[12] The factors are: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets;

---

recharacterize a loan as an equity contribution even when circumstances do not warrant equitable subordination." *In re Herby's Foods*, 2 F.3d at 133.

[11] The district court speculated as to whether a recharacterization analysis was appropriate in this case given the fact that the defendants purchased participation interests and did not loan funds directly to AutoStyle and, therefore, did not have a legal relationship with AutoStyle. We believe, however, that even though the defendants are not asserting their own claim against AutoStyle's bankruptcy estate, a recharacterization analysis is appropriate. The defendants would effectively receive funds ahead of Bayer through CIT's claim. Therefore, we must consider whether the defendants' participations in CIT's loan to AutoStyle were in reality loans, or rather a method used to funnel an equity contribution to AutoStyle. If they were the latter, we believe that it would be within the bankruptcy court's equitable power to recharacterize as an equity contribution that portion of CIT's claim based on the defendants' participation agreements.

[12] The *Roth Steel* factors were formulated in the context of a tax court case. We believe that the *Roth Steel* factors provide a general framework for assessing recharacterization claims that is also appropriate in the bankruptcy context. We note, however, that there is some disagreement as to whether tax court recharacterization factors are appropriate for use in bankruptcy cases. *See* Nozemack, *supra* page 33, at 718 & nn.219-21.

analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the *effect* is subordination of the claim "as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." *Id.* at 719. In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the *remedy* is subordination of the creditor's claim "to that of another creditor *only to the extent necessary* to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective." *In re W.T. Grant Co.*, 4 B.R. 53, 74 (Bankr. S.D.N.Y. 1980) (emphasis added).

If a claim is recharacterized and, therefore "the advance is not a claim to begin with" and the creditor is not a legitimate one, "then equitable subordination never comes into play." *In re Georgetown Bldg. Assocs.*, 240 B.R. 124, 137 (Bankr. D.D.C.). Indeed, "where shareholders have substituted debt for adequate risk capital, their claims are appropriately recast as equity regardless of satisfaction of the other requirements of equitable subordination." *In re Hyperion*, 158 B.R. at 561. Some of the confusion between the doctrines is caused by the fact that undercapitalization is a factor in the equitable subordination analysis and often is a factor in a recharacterization analysis, leading "some courts to equitably subordinate claims that other courts would recharacterize as equity contributions." Nozemack, *supra* page 33, at 717.

Because both recharacterization and equitable subordination are supported by the Bankruptcy Code and serve different purposes, we join those courts that have concluded that a bankruptcy court has the power to recharacterize a claim from debt to equity. *See, e.g., In re Herby's Foods*, 2 F.3d at 133;[10] *In re Georgetown Bldg.*, 240

---

[10]The court in *In re Hyperion*, 158 B.R. at 559, noted that the Fifth Circuit had treated recharacterization of loans as a subset of a bankruptcy court's equitable subordination powers, but one month after *In re Hyperion*, the Fifth Circuit made clear that "a court is authorized to

they are effectively in line *with* CIT and, therefore, ahead of Bayer. Bayer relies upon four legal theories to support its assertions that the defendants' claims should be subordinated to Bayer's claim. We will address each of these arguments in turn.

### A. Alleged Invalidity of the Participation Agreements

Bayer contends that the defendants did not have "true" participations in CIT's credit facility. The defendants, on the other hand, argue that their participation agreements are valid and enforceable. As a result, the defendants claim that they have the same priority position as CIT, placing them ahead of Bayer in the receipt of proceeds from AutoStyle's bankruptcy estate.

Before analyzing the arguments of the parties, it is useful to begin with a brief overview of the concept of participation agreements.

"A participation is not a loan. To the contrary, a participation is a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to the lender . . . ." *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 407-08 (S.D.N.Y. 1994). The lender, in turn, uses the funds from the participant to make loans to the borrower. *See id.* at 408. "The participant is not a lender to the borrower and has no contractual relationship with the borrower." *Ibid.* The participant's only contractual relationship is with the lender; the participant has no ability to seek legal recourse against the borrower. *See* W. Crews Lott *et al.*, *Structuring Multiple Lender Transactions*, 112 BANKING L.J. 734, 736 (1995); Patrick J. Ledwidge, *Loan Participations Among Commercial Banks*, 51 TENN. L. REV. 519, 528 (1984).

Since a participation is, by its nature, contractual, the parties to a participation agreement may choose whatever terms they wish and the agreement will generally be enforced as to its terms. *See First Bank of WaKeeney v. Peoples State Bank*, 758 P.2d 236, 238 (Kan. Ct. App. 1988). The parties

to a participation agreement are attracted by certain incentives. For the lead lender, the attractions are many:

> The lead [lender] receives immediate repayment of a portion of the loan from the participants, and is thereby able to make additional loans to either the same or to new borrowers. The lead [lender] also earns income in the form of loan origination fees and loan servicing charges. At times, the participation device permits the lead institution to accommodate consumer credit demands without exceeding its legal lending limit. The loan participation is appealing because it allows a lending institution to share the lending risk.

W.H. Knight, Jr., *Loan Participation Agreements: Catching Up with Contract Law*, 1987 COLUM. BUS. L. REV. 587, 589 (1987). By entering into participation agreements, then, the lender obtains the benefit of being able "to make a loan which is greater than its lending authority." *First Bank of WaKeeney*, 758 P.2d at 238. The participant, on the other hand, "*obtains the benefits of the lender's security interest and priority of payment.*" *Natwest USA*, 858 F. Supp. at 408 (emphasis added).[1]

In *In re Coronet Capital Co.*, 142 B.R. 78 (Bankr. S.D.N.Y. 1992), the court devised a four-part definition of a "true" participation agreement: (1) money is advanced by a

---

[1] Participants also obtain other benefits depending on their interest in the transaction. Small banks, for example, "may advertise as having helped finance the credit needs of large, well-known borrowers which would not ordinarily seeks loans from smaller institutions." Knight, *supra*, at 589. In this case the defendants are not small banks, but rather shareholders of the borrower. They claim that participation agreements offer the benefit of giving shareholders the opportunity to advance money, through the lead lender, to the shareholder's company when it is facing financial difficulty. *Cf. In re Hyperion Enters.*, 158 B.R. 555, 563 (D.R.I. 1993) (in considering equitable subordination claim involving insiders, court noted that "because insiders are the persons more interested in restoring and reviving the debtor, such bona fide efforts should be viewed with approval").

Bankruptcy Code allows courts to determine whether to disallow claims through the process of equitable subordination. *See ibid.* The court stated that, "[w]here there is a specific provision governing these determinations, it is inconsistent with the Bankruptcy Code to allow such determinations to be made under different standards through the use of a court's equitable powers." *Ibid.*

We disagree with this line of cases. Instead, we agree with the district court's decision and hold that a bankruptcy court can consider whether to recharacterize a claim of debt as equity. Bankruptcy courts that have applied a recharacterization analysis have stated that their power to do so stems from the authority vested in the bankruptcy courts to use their equitable powers to test the validity of debts. *See In re Cold Harbor*, 204 B.R. at 915; *In re Fett Roofing & Sheet Metal Co., Inc.*, 438 F. Supp. 726, 729-30 (Bankr. E.D. Va. 1977). The source of the court's general equitable powers is § 105 of the Code, which states that bankruptcy judges have the authority to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Code. 11 U.S.C. § 105(a).

The effect of a bankruptcy's court's recharacterization of a claim from debt to equity may be similar to the court's subordination of a claim through equitable subordination in that, in both cases, the claim is subordinated below that of other creditors. However, there are important differences between a court's analysis of recharacterization and equitable subordination issues. Not only do recharacterization and equitable subordination serve different *functions*, but the *extent to which a claim is subordinated* under each process may be different. These are facts that the *In re Pacific Express* court appeared not to recognize. Recharacterization cases "turn on whether a debt actually exists, not on whether the claim should be equitably subordinated." Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 501(c) Equitable Subordination?*, 56 WASH. & LEE L. REV. 689, 716 (1999) (criticizing *Pacific Express*). In a recharacterization

present evidence that the defendants engaged in inequitable conduct.[9]

### D.  Alleged Debt Should be Recharacterized as Equity

Bayer's final argument is that the bankruptcy court erred in refusing to recharacterize the defendants' "alleged" debt as equity.   Recharacterization is appropriate where the circumstances show that a debt transaction was "actually [an] equity contribution [] *ab initio*." *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997).  Bayer argues that the bankruptcy court and the district court misapplied the eleven-factor test enunciated by this court to determine whether recharacterization is appropriate. *See Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986).  Bayer asserts that it has presented sufficient evidence as to the eleven factors to withstand summary judgment.

We must first determine whether a recharacterization analysis is appropriate before we can consider Bayer's arguments.  The bankruptcy court in this case ruled that it did not have the authority to review Bayer's recharacterization claim.  The district court reversed that decision and remanded the case in order for the bankruptcy court to review the recharacterization claim.   Courts are split as to whether bankruptcy courts have the authority to recharacterize claims. Some courts have held that they do not. *See, e.g., In re Pacific Express, Inc.*, 69 B.R. 112, 115 (9th Cir. B.A.P. 1986); *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 491 (Bankr. N.D. Ohio 1988) (following *In re Pacific Express*).  These decisions have been based principally on the fact there is no specific provision of the Bankruptcy Code that allows courts to recharacterize claims. *See In re Pacific Express*, 69 B.R. at 115.  The court in *In re Pacific Express* noted that the

---

[9]Since Bayer is unable to establish the first required element of an equitable subordination claim, it is unnecessary for us to address the remaining two elements.

---

participant to a lead lender; (2) the participant's right to repayment only arises when the lead lender is paid; (3) only the lead lender can seek legal recourse against the borrower; and (4) the document is evidence of the parties' true intentions. *Id.* at 82; *see also In re Sackman Mortgage Corp.*, 158 B.R. 926, 933 (Bankr. S.D.N.Y. 1993) (applying *Coronet* factors); *In re Yale Express Sys., Inc.*, 245 F. Supp. 790, 792 (S.D.N.Y. 1965) (first articulating factors adopted as four-part definition in *Coronet*).   We believe that this definition accurately describes the factors that must be considered in order to determine if the parties have, in fact, entered into a participation agreement or another type of transaction simply labeled a participation agreement.

The defendants argue that the characteristics of their five participation agreements meet this definition.  Bayer disputes this, asserting that the bankruptcy court erred in granting summary judgment in favor of defendants since genuine issues of material fact exist as to each factor.

### 1.  Do the Agreements Document the Parties' Intentions?[2]

The defendants argue that the participation agreements themselves and the conduct of CIT as lead lender and the defendants as participants, all demonstrate that the parties intended that the transactions be "true" participation agreements.  The defendants note that AutoStyle's annual financial statements, which Bayer received, made reference to there being participations in CIT's credit facility.   The financial statements did not specifically mention the defendants, nor did they specifically state that the defendants entered into participation agreements with CIT, but they did state that "shareholders" of AutoStyle advanced additional funding to AutoStyle through CIT's credit facility.

Bayer contends that the district court improperly relied on the title of each of the participation agreements as an

---

[2]The parties address the *Coronet* factors in reverse order.  We will do the same.

indication of the parties' intention to treat the transactions as participations in CIT's loans. Bayer asserts that the parties' intentions and actions contradict the terms of the agreements. Bayer cites evidence from board meetings of AutoStyle and AutoStyle, Inc., indicating the companies contemplated that CVC and SMRS would fund direct and unsecured "bridge loans" with warrants. Bayer uses this evidence to allege that the First and Second Participation Agreements were originally intended to be bridge loans. In addition, Bayer presents evidence that, after the First and Second Participation Agreements were drafted and signed, AutoStyle gave Bayer documents indicating that the participations were unsecured "shareholder bridge loans." Bayer also relies on a CIT memorandum regarding AutoStyle that listed the defendants as "Participants" in "Special Loans" separate and distinct from and subordinated to CIT's loans and those of other participants in CIT's credit facility. Finally, Bayer relies upon an affidavit from a retired Mellon Bank official stating that "this method of providing funds by an insider is nothing more than, in reality, a capital infusion and should be treated accordingly."

Bayer's arguments are unavailing. The facts indicate that the parties intended the transactions to be true participation agreements. The fact that the first two participation agreements may originally have been intended to be another form of agreement is not by itself sufficient to demonstrate a genuine issue of material fact. Although the parties may have contemplated a different type of agreement, the transactions that the parties actually completed are what we must analyze since it is to these agreements that the parties ultimately agreed to bind themselves. Moreover, the fact that AutoStyle may have represented the transactions as bridge loans in documents it gave to Bayer is of little import, since AutoStyle was not a party to the agreements. Finally, the CIT memorandum that described the defendants' participations as "Special Loans" was not inaccurate. The memorandum made clear that the defendants had participations in CIT's credit facility and indicated that the defendants' participations were subordinated to CIT and other participants in the loan.

Undercapitalization *alone* is insufficient to justify the subordination of insider claims, however.[8] "A finding of inequitable conduct requires more than a showing of undercapitalization. There must be evidence of other inequitable conduct." *In re Hyperion*, 158 B.R. at 563; *see also In re Fabricators*, 926 F.2d at 1469. This is because "[a]ny other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company." *In re Octagon*, 157 B.R. at 858. Indeed, the quote that Bayer relies upon states that a bankruptcy court "*may*" – not *must* – equitably subordinate a claim if there is evidence of undercapitalization. *In re Tennessee Valley*, 186 B.R. at 923 n.8. A court may equitably subordinate a claim if there is "some showing of suspicious, inequitable conduct beyond mere initial undercapitalization of the enterprise." *In re Branding Iron Steak House*, 536 F.2d 299, 302 (9th Cir. 1976). Such conduct may include "fraud, spoilation, mismanagement or faithless stewardship." *In re Octagon*, 157 B.R. at 858 (quoting *In re N & D Props., Inc.*, 54 B.R. 590, 601 (Bankr. N.D. Ga. 1985), *affirmed in part, reversed in part on other grounds*, 799 F.2d 726 (11th Cir. 1986)). Bayer presents no evidence of this type of additional conduct. Therefore, Bayer's reliance on AutoStyle's alleged undercapitalization is not enough to support its equitable subordination claim.

Bayer is unable to establish a genuine issue of material fact as to its equitable subordination claim because it is unable to

---

[8]The defendants dispute whether AutoStyle was undercapitalized. However, we do not need to resolve this factual dispute, because even if AutoStyle was undercapitalized, this fact *by itself* would not be not enough for Bayer to prevail on its claim of equitable subordination.

### 3.  Claim of Undercapitalization

Finally, Bayer argues that the defendants acted inequitably because they gave loans to AutoStyle, and assumed fiduciary obligations to AutoStyle and its creditors, when AutoStyle was insolvent, undercapitalized, and unable to obtain loans from disinterested third parties.

Undercapitalization usually refers to the insufficiency of the capital contributions made to a corporation. *See In re Fabricators*, 926 F.2d at 1469.  When a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital. Moreover, undercapitalization may create circumstances in which inequitable conduct is more likely to occur.  Therefore, as Bayer points out, "if an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court . . . to equitably subordinate the loan to the claims of other creditors." *In re Tennessee Valley Steel Corp.*, 186 B.R. 919, 923 n.8 (Bankr. E.D. Tenn. 1995) (quoting *In re Herby's Foods*, 2 F.3d at 132-33).  The bankruptcy court's ability to take such action, "emanates from the . . . court's power to ignore the form of a transaction and give effect to its substance." *In re Fabricators*, 926 F.2d at 1469.

Bayer claims that AutoStyle's financial statements indicate that, during the relevant times, AutoStyle's liabilities exceeded its assets and AutoStyle could not obtain loans from disinterested third parties. Relying on *In re Tennessee Valley*, Bayer asserts that the defendants' transactions were insider loans to an undercapitalized corporation that should be equitably subordinated to Bayer's loans.

The language and form of the agreements indicates that the parties intended that the defendants have a participation interest in CIT's credit facility.  The demand notes executed by AutoStyle were given to CIT as the lender.  In addition, the stock warrants granted to CVC and SMRS referred to the holder's participation in AutoStyle's loans from CIT.

Bayer also cannot rely on the fact that the credit facility expanded as the defendants made their loans.  Indeed, one of the purposes of participation agreements is to give the lender the ability to expand its loan beyond its own limits. *See Bank of WaKeeney*, 758 P.2d at 238.  The fact that the defendants' loans were subordinated to the loans of CIT and the other participants in the credit facility is also of little help to Bayer. The participants had the ability to bargain for their relative position of repayment within the credit facility and the defendants took the risk of a subordinated, higher-risk position relative to the lead lender and other participants. *See In re Felicity Assocs., Inc.*, 197 B.R. 12, 15 (Bankr. D.R.I. 1996) (upholding validity of subordinated participation agreement and stating that a "participation agreement has 'no specified or standard form [and] no statutory characteristics, and often operates in conjunction with other documents . . . .'") (quoting Alan W. Armstrong, *The Evolving Law of Participations*, R175 ALI-ABA 255, 257 (Apr. 2, 1992)).

Bayer is left to rely only on circumstantial evidence and the affidavit of an official from the bank that loaned AutoStyle the funds that Bayer guaranteed.  The official's conclusory statement that the defendants' participations are really infusions of capital is not sufficient to overcome the overwhelming evidence that the defendants and CIT intended to enter "true" participation agreements.

### 2. Did CIT Have the Sole Right to Seek Legal Recourse Against the Borrower?

The participation agreements explicitly give CIT the sole right to seek legal recourse against the borrower.[3] Moreover, the bankruptcy court noted that the defendants did not file a proof of claim against AutoStyle. The bankruptcy court determined that this was consistent with a legitimate participation, since the lead lender holds the exclusive power to file a proof of claim. *See In re Felicity*, 197 B.R. at 14.

Nevertheless, Bayer claims that there is evidence outside of the agreements indicating that the defendants did not look solely to CIT to enforce their loans. Bayer points to that fact that one of the defendants, CVC, filed a Motion to Compel Payment of Net Rental Payments with the bankruptcy court on May 9, 1997, and the defendants have provided the principal opposition to Bayer's Motion for Adequate Protection. Bayer claims that the lead lender, CIT, should have taken action to enforce the participation loans, not the defendants.

The defendants point out that, under the participation agreements, CIT is entitled to reimbursement of its attorneys' fees for any defense costs before distribution to the defendants. The defendants state that, therefore, they chose not to use CIT's Chicago counsel and incur reimbursement costs to CIT, but instead retained their own Michigan counsel to pursue this litigation. The defendants rely on *Natwest USA*, 858 F. Supp. at 402-03, 408-09, in which a participant litigated a priority dispute with another creditor after the lead lender was repaid in full. However, in that case, the lead

---

[3] Section 4.1 of the of the First, Second, and Fourth Participation Agreements provides that "[t]he account shall be conducted solely in [CIT's] name. [CIT] is entitled to make Advances as it deems fit under the Agreements. [CIT] shall have the right to take all actions and proceedings, judicial or otherwise, that [CIT] may reasonably deem necessary or proper to protect the joint interests provided herein . . . ." The Third and Fifth Participation Agreements amended previous agreements and did not affect the language in Section 4.1.

inadequate to provide notice, because they only referred to the defendants in general terms as shareholders and did not make reference to the participation agreements. In addition, Bayer contends that before agreeing to the Mellon Bank guarantee, it inquired into the "shareholder loans" referenced in the financial statement and AutoStyle stated that they were "bridge loans" made by shareholders, not CIT. Bayer also states that it reviewed the public record, which disclosed no pertinent senior security interest held by any of the shareholders.

These arguments are insufficient to demonstrate that the defendants failed to put Bayer on notice of their claims to CIT's senior lien position. Although the references in the financial statements were not specific as to either the defendants or the participation agreements, the references were included in a discussion of CIT's credit facility. Instead of investigating this information further and contacting CIT, Bayer relied upon AutoStyle's descriptions of these agreements as bridge loans, even though they were discussed in AutoStyle's financial statements within the context of CIT's credit facility. Bayer also argues that the participation agreements were not in the public record because Bayer found no specific reference to the defendants' security interests in the public record. However, Bayer knew that CIT had a security interest, that it was expandable, and that it was ahead of Bayer's security interest. As we have previously discussed, thorough examination of CIT's credit facility and its security interest – which Bayer does not dispute *were* in the public record – would have revealed the participation agreements, the fact that the credit facility contemplated future advances that would allow it to expand, and the fact that the defendants were sharing in CIT's lien position. Bayer was on notice of the defendants' lien position through CIT's secured credit facility. The fact that Bayer was not aware of the defendants' lien position because Bayer did not conduct adequate due diligence does not justify equitably subordinating the defendants' claims.

that the defendants obtained "secret liens" through their purported participations, concealed those liens from Bayer, and took advantage of the fact that AutoStyle told Bayer that the agreements were bridge loans.

Bayer's arguments are baseless. The fact that Bayer perceives the defendants' legitimate actions to be inequitable as to Bayer is not sufficient. "In order to equitably subordinate a creditor's claim, the creditor-insider must actually use its power to control to its own advantage or to the other creditors' detriment." *In re Mr. R's Prepared Foods, Inc.*, 251 B.R. 24, 29 (Bankr. D. Conn. 2000) (quoting *In re Fabricators*, 926 F.2d at 1467). Although the defendants' actions were to Bayer's detriment, there is no evidence that the defendants used their power to control in such a way that they engaged in inequitable conduct. As we have discussed, the participation agreements are valid and enforceable. Moreover, there was no need for the defendants to file security statements regarding the agreements, since they were secured by CIT's properly and continuously perfected security interest in its credit facility. The fact that the parties originally contemplated a different form of agreement has no bearing without evidence of misconduct, which Bayer fails to provide. Similarly, AutoStyle's improper description of the agreements is of little assistance to Bayer given that AutoStyle was not a party to the agreements.

### 2. Lack of Notice to Bayer

Bayer asserts that the defendants engaged in inequitable conduct by not putting Bayer on notice of their claim to share CIT's senior lien position. Bayer states that the district court erred in concluding that Bayer was on notice. Bayer relies on two affidavits from its Director of Credit, S. Donald Campbell, stating that Bayer was not aware that investments by the defendants might be included in CIT's first lien or be covered by CIT's future advance clause. Awareness is different from notice, however. Not surprisingly, then, Bayer also argues that it was not on notice. Bayer asserts that the disclosures in AutoStyle's financial statements were

lender filed an interpleader action to allow the participant to litigate the case, an action that did not occur in this case.

We believe that the actions of the defendants do not cast doubt on the language in the participation agreements stating that the lead lender has the sole right to seek legal recourse against the borrower. Although CIT did not file an interpleader action, it was not improper for CIT to allow the defendants to hire their own counsel and provide the principal opposition to Bayer's motion in light of the fact that the defendants would have to reimburse CIT for the costs of litigating this action. Furthermore, the defendants are not seeking recourse from AutoStyle in this action; rather, they are *opposing Bayer's claim* that the defendants should not receive proceeds from AutoStyle's bankruptcy estate ahead of Bayer. Indeed, CVC's Motion to Compel Payment was filed *in response to* Bayer's Motion for Adequate Protection. Bayer is unable to point to any action by which the defendants sought legal recourse directly from AutoStyle prior to the commencement of this litigation.

### 3. Do Participants' Rights to Repayment Arise Only When Lead Lender is Paid by Borrower?

In a true participation agreement, "the participant gets paid from money the lead lender receives from the borrower." *In re Coronet*, 142 B.R. at 82. According to the agreements, the defendants' rights to repayments arose only when CIT was paid by AutoStyle.[4] In addition, other sections of the

---

[4] Section 2.2 of the participation agreements states:

Except for those payments permitted under Section 5.1 hereof and for the payment of interest when permitted under Section 3.3 hereof, it is understood and agreed that Participant's Subordinated Participation shall at all times be subordinate and postponed in payment to the repayment in full of [CIT's] and all other participants' portions of the Advances . . . .

Section 3.4 of the agreements states:

agreements indicate that the defendants relied upon the creditworthiness of AutoStyle and the collateral securing the loan.[5]  In other words, the defendants did not look to CIT to provide payments to them directly; they only looked to AutoStyle to provide payments to CIT, which would then provide payment to the defendants after CIT and the other loan participants were paid.

Bayer fails to provide an adequate argument contradicting the language of the agreements.  Bayer argues that the defendants could not have relied upon AutoStyle for repayment because by 1990 AutoStyle was in serious financial difficulty.  However, the extent to which AutoStyle was in poor financial straits does not change the language of the agreements, which states that the defendants were to be paid only when CIT was paid by AutoStyle.  Moreover, the fact that the defendants had a subordinated participation interest, in which they would not be paid until CIT and other participants were paid in full, does not affect this analysis since the defendants relied solely on the creditworthiness of AutoStyle for repayment.  This case is unlike *Coronet*, for example, in which the participant had a "contractual guarantee of repayment."  142 B.R. at 82.  In *Coronet*, the

---

[CIT] does not have, and does not assume any liability to Participant for the repayment of the Subordinated Participation or interest thereon, to the extent that such are not received from Borrower or any Guarantor of Borrower's Obligations under the Agreements, except for losses occasioned by its bad faith.

[5] Section 3.2 of the participation agreements states:

Participant acknowledges that [CIT] has not made and does not make any representations or warranties, express or implied as to Borrower's financial condition, or with respect to the validity, enforceability, collectability, priority or perfection of the Agreements, the Transactions, the Primary Collateral or the Secondary Collateral, and that Participant is fully familiar with, has made its own independent evaluation and determination of, and approves of all details thereof.

egregious conduct such as fraud, spoilation or overreaching is necessary.").  Since all three defendants were "insiders" in that they held stock in AutoStyle, Inc., the parent company of AutoStyle, Bayer argues that the defendants' conduct must be examined scrupulously.

While we apply careful scrutiny in our review of an equitable subordination claim involving an insider, we use great caution in applying the remedy:  "equitable subordination is an unusual remedy which should be applied in limited circumstances."  *Id.* at 1464; *see also In re Octagon*, 157 B.R. at 857.  This general language applies to claims involving both insiders and non-insiders.  We note that "the mere fact of an insider relationship is insufficient to warrant subordination."  *In re Hyperion*, 158 B.R. at 563.  Claims involving insiders "are not automatically subordinated" since "insiders are the persons most interested in restoring and reviving the debtor, and such bona fide efforts should be viewed with approval."  *Ibid.*  Insider transactions are more closely scrutinized, not because the insider relationship makes them inherently wrong, but because insiders "usually have greater opportunities for . . . inequitable conduct."  *In re Fabricators*, 926 F.2d at 1465.

Bayer presents three arguments to support its claim that the defendants engaged in inequitable conduct.  We will address each of these arguments in turn.

### 1. Participations Are Actually Disguised Bridge Loans

Bayer argues that the defendants engaged in wrongful conduct by disguising bridge loans as participations and securing them by what Bayer alleges are "secret liens" through CIT's credit facility.  Bayer relies on minutes from board meetings of AutoStyle and AutoStyle, Inc., in which the boards discussed the possibility of junior, unsecured, direct "bridge loans" from CVC and SMRS to AutoStyle.  Bayer alleges that these bridge loans were "suddenly recast as (purported) subordinated participations" in the CIT credit facility through the First and Second Participation Agreements.  In addition, Bayer offers conclusory allegations

### C.  Alleged Inequitable Conduct Requiring Equitable Subordination

Bayer asserts that the defendants' claims should be equitably subordinated to Bayer's claims pursuant to Section 510(c) of the Bankruptcy Code, which provides:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may –
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . .

11 U.S.C. § 510(c)(1).

This court has adopted a three-part standard for establishing equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;  and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *See In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d 712, 717-18 (6th Cir. 1992) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 699-700 (5th Cir. 1977)).  Satisfaction of this three-part standard does not mean that a court is *required* to equitably subordinate a claim, but rather that the court is *permitted* to take such action. *See In re Octagon Roofing*, 157 B.R. 852, 857 (N.D. Ill. 1993).

When reviewing equitable subordination claims, courts impose a higher standard of conduct upon insiders.  Indeed, "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *In re Fabricators*, 926 F.2d 1458, 1465 (5th Cir. 1991); *see also In re Hyperion*, 158 B.R. at 563.  Therefore, "if the claimant is an insider, less egregious conduct may support equitable subordination." *In re Herby's Food, Inc.*, 2 F.3d 128, 131 (5th Cir. 1993); *cf. In re Fabricators*, 926 F.2d at 1465 ("If the claimant is not an insider, then evidence of more

---

lead lender was required to pay the participant, notwithstanding the payments it received from the borrower. *See ibid.*   There is no evidence of such an arrangement between CIT and the defendants.

### 4.  Did Participants Advance Money Directly to Lead Lender?

The defendants rely upon evidence that they submitted indicating that they paid money directly to CIT, not to AutoStyle. Other evidence demonstrates that only CIT loaned funds to AutoStyle and only CIT had a direct contractual relationship with AutoStyle.

Bayer is unable to establish a genuine issue of material fact as to this element.  Bayer relies only on minor inconsistencies in the record, none of which directly contradict the facts presented by the defendants indicating that they paid money directly to CIT.

\* \* \*

After assessing each of the four elements necessary for a "true" participation agreement, we conclude that the defendants have convincingly demonstrated that each of the participation agreements meets this definition.  The facts relied upon by Bayer are insufficient to establish a genuine issue of material fact as to validity of the agreements.

Since we have determined that the participation agreements were valid, legal, and enforceable, the weight of Bayer's three remaining arguments is significantly weakened.

### B.  Alleged Failure to Perfect a Security Interest

Bayer argues that the defendants should have obtained a security agreement signed by AutoStyle as required by Section 9-203 of the Uniform Commercial Code (U.C.C.). In addition, Bayer argues that the defendants did not file

financing statements disclosing that they were secured creditors, as required by Section 9-402 of the U.C.C.[6]

Bayer argues that by failing to give notice that they were funding AutoStyle, the defendants "deceptively denied Bayer the opportunity to make an informed decision" regarding whether Bayer's credit terms should be different, whether subordination agreements should be demanded,[7] and whether to extend additional credit.

Bayer's claim is wholly without merit. The U.C.C. does not require participants to obtain separate security agreements or to file separate financing statements, nor does the U.C.C. require a lead lender's financing statement to identify participants in the underlying loan. A loan participant does not obtain a separate security interest for which it is required to file a separate financing statement; rather, it "*obtains the benefits of the lender's security interest* and priority of payment." *Natwest USA*, 858 F. Supp. at 408 (emphasis added). When participation agreements "clearly contemplate a sale and complete transfer of an ownership interest to the participant," as in this case, "[t]he participant then owns an undivided portion of the [lead lender's] loan and any security interest thereunder." Bradford Anderson, *Loan Participations*

---

[6]We note that Article 9 of the U.C.C. has been revised effective July 1, 2001. *See, e.g.,* Elaine A. Welle, *An Introduction to Revised Article 9 of the Uniform Commercial Code*, 1 Wyo. L. Rev. 555 (2001); Harry C. Sigman & Edwin E. Smith, *Revised U.C.C. Article 9's Transition Rules: Insuring a Soft Landing--Part II*, 55 Bus. Law. 1763 (2000); Harry C. Sigman & Edwin E. Smith, *Revised U.C.C. Article 9's Transition Rules: Insuring a Soft Landing*, 55 Bus. Law. 1065 (2000). Since the transactions in this case were completed before the revised Article 9 became effective, we will apply Article 9 as it existed before the revisions and will not speculate on the effect of the revised Article 9.

[7]Bayer notes that it demanded and received a subordination agreement from SMRS in the instant transaction (although the agreement did not involve SMRS's participation interest since Bayer claims it was not aware of the interest), and from CIT, MascoTech, and SMRS in other transactions.

misleading" what is a legitimate business practice. Moreover, once creditors are aware that a secured loan is made, they have a duty of inquiry to determine if participation interests have been sold, if they think that such knowledge would be important.

Second, Bayer argues that the defendants' participation interests are not covered by the future advance clause in CIT's credit facility. Bayer contends that while the U.C.C. contemplates "floating collateral" through after-acquired property provisions and "floating debt" through future advance clauses, it does not contemplate "floating secured parties." *In re E.A. Fretz Co., Inc.*, 565 F.2d 366, 369, 372 (5th Cir. 1978). Bayer asserts that the defendants are "floating secured parties" who had unsecured interests that were only secured by CIT's future advance clause. The court in *In re E.A. Fretz* stated that:

> the UCC clearly contemplates and sanctions floating collateral (after-acquired property of the debtor) and floating debt (future advances). However, the UCC does not . . . contemplate "floating secured parties," that is, an open-ended class of creditors with unsecured and unperfected interests who, *after the debtor's bankruptcy, can assign* their claims to a more senior lienor and magically secure and perfect their interests under an omnibus security agreement and financing statement.

*Id.* at 369 (emphasis added). Nothing of the sort happened in this case. The defendants legitimately took advantage of the future advance clause in CIT's credit facility. The defendants never were "floating secured parties." They were not an open-ended class of creditors. Moreover, they did not have "unsecured and unperfected interests" that they assigned to a more senior lienor. Rather, the defendants had secured and perfected interests as soon as their participation interests came into existence.

Bayer's arguments are insufficient to demonstrate that the defendants were required to perfect separately their security interests in CIT's credit facility.

The financing statement filed by CIT was sufficient to put Bayer on notice of the fact that CIT may have had a security interest relating to AutoStyle. It was Bayer's obligation to inquire as to extent of CIT's security. Instead of contacting CIT to determine the extent of CIT's credit facility, which Bayer does not allege it ever did, Bayer relied on AutoStyle's inaccurate representations of the defendants' participation interests as bridge loans. Indeed, "financing statements . . . disclose[] sufficient information to enable any concerned creditor to contact [the necessary parties for further details]. *The Code helps only those who help themselves*." *In re King-Porter Co.*, 446 F.2d 722, 729 (5th Cir. 1971) (emphasis added). Bayer simply cannot be rewarded for its lack of due diligence in failing to contact CIT.

Bayer offers two reasons to divest the defendants of the security they obtained through CIT's credit facility. First, Bayer states that the failure of the defendants to file financing statements, or to be disclosed on CIT's financing statements, is "seriously misleading." U.C.C. § 9-402(a); *In re Copper King Inn, Inc.*, 918 F.2d 1404, 1408-09 (9th Cir. 1990). In *Copper King*, the court ruled it was improper for insider affiliates to claim secured status for loans extended to a related debtor based on a UCC-1 financing statement that included the affiliates' names, but not the true source of the funds for the loans. *Id.* at 1408. The court stated that "the omission of a creditor's name could be seriously misleading, especially in situations like the one presented here, where officers and shareholders in the debtor company are also its creditors." *Ibid*. *Copper King* did not involve a participation agreement, however, but a direct secured loan. The court properly determined that the failure "to identify the true source of the credit" was "seriously misleading." *Ibid.* In this case, the financing statement did identify the true source of the credit – CIT. To impose a rule that it is seriously misleading for a lead lender to file a financing statement and not indicate participants in its loans (either at the time of filing or later by amendment) would have negative consequences. It would impose an unnecessary burden on lead lenders and participants and would label as "seriously

*and the Borrower's Bankruptcy*, 64 AM. BANKR. L.J. 39, 42 (1990). As one observer has stated:

> The custom among banks has been that the [participant] makes no effort to perfect any security interest it may have, either by filing under the Uniform Commercial Code or under recording laws relating to real property. Rather, the [participant] relies upon the [lead lender] and the filings and recordings made by the [lead lender] for the perfection of its rights against the borrower's property. Section 9-302(2) of the Uniform Commercial Code provides that if a secured party assigns a perfected security interest, no filing under Article 9 is required in order to continue the perfected status of the security interest. In defining a 'secured party,' section 9-105 of the Code provides that when the holders of obligations issued under an indenture of trust, equipment trust agreement, 'or the like' are 'represented' by a trustee or other person, the representative is the secured party.

Ledwidge, *supra* page 11, at 529. We believe that this "custom" is supported by cases, which in analogous circumstances have considered the issue of whether a participant in a loan is required to file separate financing statements.

In *First State Bank v. Towboat Chippewa*, 402 F. Supp. 27 (N.D. Ill. 1975), a creditor challenged a properly perfected ship mortgage on the ground that a loan participant was not specifically named therein. The court held that it was not necessary that the unidentified participants in the mortgage comply with the requirements of the Ship Mortgage Act to preserve the mortgage. *Id.* at 33-35. Bayer properly points out that this is not a U.C.C. case and that the loan participant was not a shareholder. We believe, however, that the same principle – that a loan participant does not have a separate obligation to comply with statutory requirements – applies in this case.

Similarly, in *In re Fried Furniture Corporation*, 293 F. Supp. 92, 93 (E.D.N.Y. 1968), the court upheld the Small

Business Administration's lien on the debtor's property, despite the facts that the SBA, as a loan participant, had not made a separate U.C.C. filing, and that the lead lender's financing statement indicated that it had made the entire loan. The court stated that "[w]here a number of persons furnish funds to participate in a loan made by one of them – a not uncommon situation – there is no point in requiring each to file a separate piece of paper to clutter up recording files." *Ibid.* We believe the same analysis applies in this case.

Another similar case involved a creditor who entered into a contract with the United States and then assigned all payments from that contract to a third party. *See Indus. Packaging Prods. Co. v. Fort Pitt Packaging Int'l, Inc.*, 161 A.2d 19, 20 (Pa. 1960). The assignment was challenged on the basis that the creditor's financing statement was insufficient because it did not mention the assignment. The Pennsylvania Supreme Court held that the financing statement was sufficient. The court stated that "[t]he Uniform Commercial Code does not require that the secured party as listed in such statement be a principal creditor and not an agent." *Id.* at 21. The court also stated that the filing, which made reference to future advances, reasonably identified the collateral security. *Ibid.* The court noted language in U.C.C. § 9-204(3) that "a security agreement may provide that collateral, whenever acquired, shall secure any advances made or other value given *at any time* pursuant to the security agreement." *Ibid* (emphasis added).

The filing made by CIT was proper even though it did not specifically mention the defendants and their participation interests. The filing made reference to the credit facility, which included a future advance clause that stated that CIT "will from time to time make advances to [AutoStyle] upon the security" of the collateral, which was a lien on all of AutoStyle's assets. By filing this financing statement, CIT put potential creditors on notice of its credit facility and the possibility that it could expand and could include participants, such as the defendants. By entering into participation agreements with CIT, the defendants obtained a portion of

CIT's loan and most importantly, the protection of its security. The fact that the defendants' participation interests were subordinated *within the credit facility* by the defendants' contractual arrangement with CIT does not change the fact that the defendants were able to take advantage of CIT's secured position, and that outsiders were able to inquire as to the size and nature of the defendants' subordinated interests.

This result is supported by U.C.C. § 9-402, which contemplates that when a creditor files a financing statement, third parties have a duty to conduct further inquiry into the creditor's security interest. Section 9-402:

> adopts the system of 'notice filing' . . . . What is required to be filed is not . . . the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. *Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs*.

U.C.C. § 9-402 note 2 (1992) (emphasis added). The duty of inquiry created under U.C.C. § 9-402 is well recognized by courts. *See, e.g., In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560, 1565 (10th Cir. 1995) (quoting *4447 Assocs. v. First Sec. Fin.*, 889 P.2d 467, 473 n.9 (Utah Ct. App. 1995)) ("A financing statement only offers notice that a security interest may exist, and requires potential creditors to make further inquiry to confirm the existence of specific details of the transaction."); *In re Northeast Chick Servs., Inc.*, 43 B.R. 326, 332 (Bankr. D. Mass. 1984) ("The purpose of a financing statement is merely to give notice of the existence of a secured transaction and, that further inquiry as to the particulars is prudent."); *Signal Capital Corp. v. Lake Shore Nat'l Bank*, 652 N.E.2d 1364, 1371 (Ill. App. Ct. 1995) ("The purpose of the financing statement is to put third parties on notice that the secured party who filed it may have a perfected security interest in the collateral described, and that further inquiry into the extent of the security interest is prudent.").